**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032 | Civil Action No. 4:26-MC-0006-O |

**APPENDIX IN SUPPORT OF NOTICE**

| Exhibit No. | Description | Appendix No. |
|:---:|:---:|:---:|
| 1 | District of Rhode Island May 12, 2026 Hearing Transcript | App. 4 – App. 197 |

Dated: May 19, 2026

Respectfully submitted,

*/s/ Mindy M. Sauter*_____
Mindy M. Sauter
Texas Bar No. 24033114
MCGUIREWOODS LLP
2601 Olive Street
Suite 2100
Dallas, Texas 75201
T: (469) 372-3916
F: (214) 273-7470
msauter@mcguirewoods.com

Eric G. Olshan (*Pro Hac Vice*)
MCGUIREWOODS LLP
Tower Two-Sixty, 260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-6000
F: (412) 667-6050
eolshan@mcguirewoods.com

App. 1

Kathryn M. Barber (*Pro Hac Vice*)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

Robert L. Webster
Texas Bar No. 21053375
8350 N. Central Expressway
Suite 1900
Dallas, TX 75206
T: (817) 953-8699
robert.webster@bobwebsterlaw.com

App. 2

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the Appendix in Support of Notice was filed electronically with the clerk of court via ECF, which will provide electronic service on all counsel of record.


Dated: May 19, 2026                    */s/ Mindy M. Sauter*_____
                                       Mindy M. Sauter

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * * 26-MC-07-MSM
                                *
In Re: Administrative Subpoena *
25-1431-032 to Rhode Island    * MAY 12, 2026
Hospital                       *
                               *
                               * Courtroom 1
                               * PROVIDENCE, RI
* * * * * * * * * * * * * * *   *


BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(Motion to Quash)


**APPEARANCES:**

FOR THE PETITIONERS:
Child Advocate for the      KEVIN LOVE HUBBARD, ESQ.
State of Rhode Island       DeLuca, Weizenbaum, Barry &
                            Revens
                            199 North Main Street
                            Providence, RI  02903

Rhode Island Hospital       ERIC G. OLSHAN, ESQ.
                            McGuireWoods LLP
                            260 Forbes Ave. Ste 1800
                            Pittsburgh, PA  15222-3142

FOR THE RESPONDENT:         BRANTLEY T. MAYERS
United States of America    JORDAN C. CAMPBELL
                            DOJ-Civ
                            950 Pennsylvania Avenue NW
                            Washington, D.C.   20503

Court Reporter:             Denise P. Veitch, RPR
                            One Exchange Terrace
                            Providence, RI  02903

12 MAY 2026 -- 2:00 P.M.

THE COURT:  Good afternoon.  Thank you for accommodating us with the change of court.

(Discussion off the record)

THE COURT:  We are on the record in a miscellaneous petition and we've moved courtrooms because we seem to have a lot of *amici* and other interested parties.  The case number for us is 26-MC-007, and it's an In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital.

So will counsel identify themselves for the record.

MR. LOVE HUBBARD:  Good afternoon, your Honor. Kevin Love Hubbard on behalf of the Child Advocate for the State of Rhode Island.

MS. ROMERO:  Good afternoon.  Amy Romero for the Office of the Child Advocate for the State of Rhode Island.

MS. LABINGER:  Lynette Labinger for the Office of Child Advocate.

MS. NAKASIAN:  Good afternoon, your Honor. Stacey Nakasian on behalf of Rhode Island Hospital.

MR. OLSHAN:  Good afternoon, your Honor. Eric Olshan on behalf of Rhode Island Hospital.

THE COURT:  Okay.

MR. MAYERS:  Good afternoon, your Honor. Brantley Mayers as counsel to the Assistant Attorney General Subdivision.

THE COURT:  Okay.

MR. CAMPBELL:  Good afternoon, your Honor. Jordan Campbell on behalf of the Government.

THE COURT:  Okay.  Now, I spoke to -- let me back up.  This was begun by the Child Advocate's motion to quash the administrative subpoena that the Department of Justice issued to Rhode Island Hospital. The Department of Justice responded, and Rhode Island Hospital moved to intervene here.  So they filed their papers on the weekend, I think Saturday, the motion to intervene and the brief that went along with it.

So the options today are to argue both petitions or stay the compliance with the subpoena unless and until Rhode Island Hospital has an opportunity to -- I'm sorry, the Department of Justice has an opportunity to respond to Rhode Island Hospital's motions and then have another hearing, or, decide it on the papers.  So I think I'll go with the Government selection.  We can't -- the compliance with the subpoena needs to be stayed in order to give you more time, if you seek the time.  Are you seeking more time?

MR. MAYERS:  No, your Honor.  We're fine to

argue both today.

THE COURT:  Okay.  Great.  So I'll begin by hearing from the Office of Child Advocate.

MR. LOVE HUBBARD:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. LOVE HUBBARD:  I want to start by thanking the Court and everybody on your staff for responding so promptly to this emergency filing.  I know we burden you with a lot of emergency filings and though it's not of our own making, we still know that it's a lot and there's been a lot of paper filed.  So I'm going to endeavor to be brief and invite you to ask any questions so that we can address what's on your mind, but thank you again for setting this hearing in such a hurry.

Your Honor, in this case the Child Advocate for the State of Rhode Island asks the Court to enforce the limits that Congress and the constitution impose on the Government's ability to demand compliance with administrative subpoenas and to protect the constitutional rights of vulnerable children in the State's care.

The Government issued a HIPAA subpoena to Rhode Island Hospital demanding the identities and complete medical records of every child and some young adults

who received medical care for gender dysphoria at Rhode Island Hospital over the course of more than five years.  That subpoena was issued as part of a publicly-declared campaign by the Trump Administration to end that very medical care; care that is lawful, protected by Rhode Island state law, recognized as medically necessary by every major medical association, and regarded as lifesaving by the patients and the their families in Rhode Island.  The Child Advocate, Katelyn Medeiros, who is here today, moved to quash the subpoena because she has a duty to protect the children in State care and custody, children who will be irreparably harmed if their motion is not granted.

The core questions before the Court are straightforward:  Was the subpoena issued for a legitimate purpose, and, if so, does it seek information relevant to that purpose.  As the record in this case and in seven other decisions from federal courts evaluating identical subpoenas make clear, the answer to both questions is no.

THE COURT:  But are we at that point or are we not at that point because Rhode Island Hospital never moved to quash the subpoena in the first place.

MR. LOVE HUBBARD:  We are at that point of determining whether the subpoena had a proper purpose

and also I think because the Child Advocate moved to quash and has standing to move to quash on a number of bases, which we'll get to, and there's an immediate need for the Court's intervention for -- based on events that are outside of our control.  We have to answer that question now, yes.

THE COURT:  Okay.  Go ahead.

MR. LOVE HUBBARD:  Though the core questions are straightforward, unfortunately this case is no longer straightforward because the Government's forum-shopping tactics, but in the end the complications raised by those tactics are simply irrelevant.

This Court unquestionably has jurisdiction.  The Government does not contest that.  And we are not asking this Court to do anything other than evaluate the subpoena pursuant to the standards that the Constitution and the administrative subpoena statute require, and protect the independent constitutional rights of Rhode Island's children, which have never been considered by any other Court.  You are the first to consider that interest.  This Court can and should exercise its jurisdiction to protect those rights and redress the immediate harm by quashing the subpoenas in their entirety.

THE COURT:  So can we -- we're talking about a

constitutional right to informational privacy.  Is that essentially the constitutional rights that we're talking about?

MR. LOVE HUBBARD:  In addition to their Fourth Amendment limits on subpoenas.

THE COURT:  Right.  And with respect to informational privacy, in reading *Dobbs*, Justice Alito, who wrote for the majority, made a very clear distinction between decisional and informational privacy and seemed to say that *Roe*, which they overturned as you know in *Dobbs*, was wrongly decided because it was premised on decisional privacy, and he's clear that there's a distinction, and I think that the *Dobbs* case does tie the Supreme Court into the *Whalen v. Doe* case line of informational privacy.

Can you address informational privacy at some point.  If now is not appropriate, you can do it later.

MR. LOVE HUBBARD:  Absolutely.  I'd be happy to address that now.  I think there, as you identified they are in the First Circuit and I think, you know, *Dobbs* as a complicating factor on informational privacy we can certainly talk about, but there is also --

THE COURT:  But, I'm sorry, maybe I'm misreading *Dobbs,* but I see the First Circuit case law is that there is informational privacy --

App. 11

MR. LOVE HUBBARD:  Absolutely.

THE COURT:  -- and I see *Dobbs* as affirming that.

MR. LOVE HUBBARD:  Absolutely.

THE COURT:  Okay.

MR. LOVE HUBBARD:  And the First Circuit also has decisional privacy -- excuse me; that was my error.

THE COURT:  Oh, I apologize.

MR. LOVE HUBBARD:  No, no, my fault.

The First Circuit also recognizes that ensuring autonomy in personal decisions, and I don't think anything, you know, that hasn't been revisited in light of *Dobbs* in the First Circuit, but there's nothing about the autonomy and decisional privacy rights that are implicated in the subpoenas that has been overturned by *Dobbs*.  I don't think that is a fair reading of that case as applied to this unique set of circumstance.

THE COURT:  I agree.  Okay.  I didn't mean to complicate it; I just wanted to...

MR. LOVE HUBBARD:  So I want to start with some updates on procedural posture to the extent that I know them, and Rhode Island Hospital and the Government are actually parties in the other proceeding, but I'm just going to tell you what I know as relevant to my

argument.

In the Northern District of Texas over the weekend, the court there denied Rhode Island Hospital's motion to stay enforcement of its order compelling compliance with the subpoena.  That order appears to have denied the stay but also temporarily state enforcement as to some of the records at issue, although not all of them.

THE COURT:  And that would be the personally-identifying information of the minor patients.

MR. LOVE HUBBARD:  I believe so.

THE COURT:  I think it's Requests 11 through the end.  I don't know --

MR. LOVE HUBBARD:  Right, 11 through 15.

THE COURT:  Okay.  11 through 15.

MR. LOVE HUBBARD:  That's my understanding of the court's order.

THE COURT:  That's my reading of it as well.

MR. LOVE HUBBARD:  And then in the Fifth Circuit proceeding, Rhode Island Hospital has appealed in the Fifth Circuit.  The Government apparently filed its opposition at some point while we were in this courtroom and the Hospital I think intends to reply, but we're awaiting a ruling from the Fifth Circuit on

the stay motion.

THE COURT:  On the stay.

MR. LOVE HUBBARD:  There's another development late last night, that NYU Langone issued a public statement that they were one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas.  According to that public statement which they issued under their state shield law -- just like Rhode Island has a shield law -- New York has a shield law that requires them to provide notice if the patients' records in gender-affirming care cases are at issue. According to NYU, that subpoena directs NYU to provide information pertaining to patients under the age of 18 who received gender-affirming care between 2020 and 2026.  That's relevant only because when I talk about venue and I talk about grand jury subpoenas, I want you to know that I learned about it from a public filing and nothing that we shouldn't have heard about.

THE COURT:  And you're telling me that that's a grand jury subpoena in Texas?

MR. LOVE HUBBARD:  Issued from Texas to NYU Langone, yes.

THE COURT:  So if there's a grand jury convened, and that's obviously public since NYU Langone issued

that statement, and assuming it's true, why -- what's the difference between a grand jury subpoena and an administrative subpoena?  My reading of it is that a grand jury subpoena has more force and also requires more confidentiality.  Am I missing that?

MR. LOVE HUBBARD:  I don't think so, your Honor, and the standards for grand jury subpoenas aren't at issue here.  But what's important about it is that NYU, according to its statement, received the subpoena May 7th, 2026.  And so the temporal order of things, the administrative HIPAA subpoena in this case issued in July 2025, served on Rhode Island Hospital July 9th, and the Government moved after months of silence about Rhode Island Hospital's attempts to meet and confer about that subpoena, moved to compel in the Northern District of Texas in late April this year.

THE COURT:  So I want to talk about that April 30th date, and I intend to talk to the Government about it as well.  So my reading of the record is that the same gentleman who filed the brief in Texas and I think signed on to the brief here is a man named Ross Goldstein, and I assume he's DOJ, I assume he's in northern Texas, but I think that probably is a bad assumption.

MR. LOVE HUBBARD:  He is not in Texas.

App. 15

THE COURT:  He's in D.C.; correct?

MR. LOVE HUBBARD:  Yes.

THE COURT:  Okay.  So that there's an e-mail from him -- is it from him or am I looking at the wrong e-mail.  There's an e-mail where the attorney from Rhode Island Hospital says essentially, you know, we'd like to get together and talk about search terms and obviously they're talking about complying with the subpoena, and Rhode Island Hospital then says they hear nothing for several weeks and then on the 28th this gentleman I think is the one who --

MR. LOVE HUBBARD:  A different person from D.C.

THE COURT:  Oh, I apologize.

MR. LOVE HUBBARD:  That's all right.  Also is an attorney from D.C.  It's very important.

THE COURT:  And he says okay, you know, sorry I was out for a couple of weeks; even though it was maybe two-and-a-half months of no response from DOJ.  And they say, here it is:  So the DOJ says, he says I've been out for a few weeks, and he requests a conference and that's on the 28th of April.  On the 29th Rhode Island Hospital agrees and sends an e-mail saying, hey, let's connect whatever date next week, Monday, whatever.  And then there's no response until after the order in Texas is filed and granted.  Is that -- and

the response is an e-mail to the attorney for Rhode Island Hospital that includes a copy of the motion and the order.  Is that accurate?  It looks like it's at 6:10 p.m.  I don't know if that's Texas time.  I'm assuming it is, but...

MR. LOVE HUBBARD:  That's a completely accurate summary of the record as I understand it.

THE COURT:  Okay.  Thank you.

MR. LOVE HUBBARD:  There are a number of things that are important about that.  First of all it reflects the Government's litigation conduct which is relevant to the Court's evaluation of the timeliness of any motion to quash.  I don't think any of those rules apply to the Child Advocate, who not a party to the subpoena, who had no opportunity to be heard about it, had no -- hadn't seen it.  I don't think those rules apply.  But even if they did, we cited extensive cases to the Court where courts can excuse untimeliness where there is (1) no prejudice to the party asserting delay; and certainly the Government could not claim any prejudice when it was the one was silent for months at a time, asked for a meet and confer, ignored the Hospital's response and moved to quash in a distant forum.  And again, Rhode Island Hospital will be better suited to speak to this, but it's my understanding that

that was the first that Texas had ever been mentioned to Rhode Island Hospital, after -- when the order was already granted. Before that they were only having interaction with DOJ in D.C. and now will be relevant to the collateral attack doctrine and venue in Rhode Island -- in Texas, excuse me.

I do want to get to all those things, your Honor, but I do think stepping back from the sort of legal abstractions and the procedural morass of this case which is the result of the Government's conduct; because we represent the Child Advocate, part of my job here today is to attempt to keep things focused on the interest of the children that she represents.

THE COURT: I apologize.

MR. LOVE HUBBARD: No, no, not at all.

But there are real children, your Honor, young adults and their families who are being deeply affected by the subpoena and by the Government's attempts to go to Texas to enforce it.

I've heard from multiple parents of children who have received care at Rhode Island Hospital over the last week since we filed this motion. They're terrified that the Hospital will be forced to turn over their children's identities and most intimate medical records to the Government that has repeatedly and

publicly demeaned them and declared its hostility towards them and their families.

I spoke with one person who told me that their child struggled with suicidal thoughts before receiving care and that the medical care to treated gender dysphoria that they received at Rhode Island Hospital saved their child's life. They told me the subpoena, quote, is designed to put the trans and trans-supporting community in fear, to force people back into closets and despair, and that they would do anything to prevent that from happening to their child.

I spoke to a second parent who told me that her family had recently moved to Rhode Island specifically because they believed the medical care for gender dysphoria that their child depended on would be protected here after they were forced to uproot their lives and move from a state that implemented a ban on that care. They moved to Rhode Island to ensure their child would be safe and to be in a place where they could have the care that their child needs to thrive. They are willing to move heaven and earth for their child. They should not have to worry about being targeted by the Federal Government.

THE COURT: Can I have one second. Carrie.

(Judge confers with Clerk)

App. 19

THE COURT:  Sorry.

MR. LOVE HUBBARD:  Not at all.  I know it's not your courtroom.

(Pause)

THE COURT:  Thank you.

MR. LOVE HUBBARD:  Thank you.

Those are the real world consequences of what the Government is asking this Court to permit.  They're not abstract by these interests; they are children and families in Rhode Island right now living in fear of their own Government.  That context matters when this Court balances the Government's asserted need for whatever information it's seeking against the injury, the disclosure of that the information would cause constitutional injury to those children's rights.

So that injury segues naturally into the question of standing.  The Child Advocate is asserting the privacy and welfare interests of children in DCYF custody, care or treatment of children Rhode Island law specifically charges her to protect.  This Court has already recognized in its order denying the motion to transfer that the Child Advocate was not a party to the Northern District of Texas proceeding and had no notice or opportunity to be heard there.  And the district court in Texas was explicit in its order denying the

stay over the weekend, that it did not consider patients' privacy rights in granting the Government's motion to compel.

THE COURT:  Is there any indication that they considered Rhode Island law at all?

MR. LOVE HUBBARD:  None.

THE COURT:  Okay.  And I ask because, you know, this sort of, I get the preemption issue and the argument, but seems to be an analysis that says that the federal HIPAA sets the floor and states can set higher standards.  I wrong on that?  It's also on HSS's website, too.

MR. LOVE HUBBARD:  I think that is true, your Honor.  I think, you know, unfortunately -- I take the Government's ability to conduct legitimate healthcare fraud investigation seriously, as you know, --

THE COURT:  Yes.

MR. LOVE HUBBARD:  -- and a HIPAA subpoena in general does preempt contrary to state law; I will acknowledge that.  But the question of state law that is undoubtedly important here that the Texas court didn't consider is that this care is lawful, protected, and eligible for Medicaid reimbursement in the State of Rhode Island, and that the Federal Government does not get to make a contrary choice.  The Supremacy Clause

does not entitle the Federal Government to decide to ban care that the State has chosen to both authorize and protect.

THE COURT:  But the hospital -- the Government is saying, hey, we're not trying to ban anything, we're just trying to get information to see if people are mislabeling the drugs, and we'll get into that with the Government about who can be responsible for a crime of misbranding or mislabeling because I don't think hospitals can be, but...

MR. LOVE HUBBARD:  I think that's absolutely right.  But I want to in terms of the order of the Court's operation of decision we have to decided the purpose first; right?  So there's the question of whether the subpoena meets the standards for the issuance of an administrative subpoena and the enforcement thereof, and that would be does it have a lawful purpose, is it relevant, and then is it reasonable to the lawful purpose.  So the purpose analysis comes first, and that's critical here because it's the heart of this case.

The Government's purpose in issuing the subpoena is explicit.  We're not asking the Court to second-guess is this prosecutorial discretion or resolve a debatable legal question.  The Government's

own statements establish repeatedly and unambiguously that the purpose of these subpoenas is to end lawful medical care, not to investigate any federal crime.

Seven decisions of federal courts have so found, and what's important about those seven decisions isn't just that they were unanimous until the chosen forum gave a contrary order; it's that over the course of those seven decisions what you see is DOJ offering shifting and inconsistent explanations fishing about for a legitimate purpose. As the court in the Eastern District of Pennsylvania found, quote, the Department of Justice has shifted its explanations for the investigation before us our colleagues across the nation have identified problems with the Department's numerous subpoenas.

And that's true here now. We get a slightly different gloss on their attempts to find a legitimate FDCA purpose in this court than they offered in the other courts.

And in its opposition to our motion here the Government quibbles with a few of the interpretations of a couple of statements that we offer. But what they don't address is that when asked for comment after a court quashed an identical subpoena because the court found it had an improper purpose, the Department of

Justice responded:  This Department of Justice will use every legal and law enforcement tool available to protect innocent children from being mutilated under the guise of care.  As the *QueerDoc* Court found, no clearer evidence of improper purpose could exist than the Government's own repeated declarations.

There's an eighth case, your Honor, that's relevant.  It's not about the exact same subpoenas here.  But about three days ago, maybe four days ago in the District of Columbia, Judge Boasberg issued an opinion quashing a subpoena from the Federal Trade Commission.  The case is *Endocrine Society vs. Federal Trade Commission,* the cite is 26-CV-0512-JEB.  It's not a HIPAA subpoena case, but it is relevant because Judge Boasberg described the DOJ subpoenas and the FTC demands as part of the same "multi-agency campaign." He rejected the Government's argument -- which it makes here too -- that there is no cause of action allowing the recipient of a CID to challenge the violation of its constitutional rights.  That's wrong for all the reasons we'll talk about when it comes to standing.

He reaffirmed the unremarkable principle that a plaintiff subject to unconstitutional action by executive officers can sue those officers, to enjoin those actions.  And he also talked at length about a

workshop offered by the FTC called The Dangers of "Gender-Affirming Care" for Minors.  Now, we cited statements from Deputy Assistant Attorney General Campbell of the Enforcement and Affirmative Litigation Branch of the Civil Division of the Department of Justice in our motion to quash.  The Government's opposition claimed that we mischaracterized the statement.

As I think the discussion from Judge Boasberg at that workshop will make clear, as will the transcript itself, we did not mischaracterize the statement.  And the relevance of that statement to the Government's improper purpose has only increased since then since Deputy Attorney Assistant General Campbell has now appeared in this case.

There's a difference between the Administration prioritizing enforcement of existing law in an area of policy concern and one that issues subpoenas to end the lawful practice through intimidation and law fear (phonetic).  The former is enforcement discretion; the latter is an abuse of process.  The Government has told us which one this is.

And I think, your Honor, improper purpose cases are often difficult, right, we're asking you to look behind the subpoena and determine what the Government

was thinking when it issued.  This is not a difficult case.  The purpose is in black and white.  They've made it clear over and over and over again.

The Government's only response with respect to purpose is to say that you'd have to find that it was the sole purpose of the improper purpose to quash the subpoena and that even if it was partly motivated by this improper purpose, that shouldn't matter because they may have had another legitimate purpose.  But the question isn't whether the Government can generate an imaginary legitimate purpose; it's whether the Government's actual purpose is legitimate on the record before the Court.  A legally foreclosed theory doesn't become a legitimate purpose just because the Government labels it one.  On the record here, including the Government's own admission that Rhode Island Hospital was not suspected of any criminal wrongdoing, shows that its FDCA theories were developed after the subpoena issued --

THE COURT:  And they also say nor were the children or the caregivers for the children; is that correct?

MR. LOVE HUBBARD:  Correct, your Honor.

THE COURT:  Go ahead.  I'm sorry.

MR. LOVE HUBBARD:  The explanations for their

FDCA theory has shifted again in this court, but the subpoena hasn't shifted and the improper purpose that motivates them not changed.

This is not a legitimate criminal investigation. It's a campaign of intimidation and harassment designed to achieve a policy goal, the end of medical care for gender dysphoria that the Executive Branch otherwise lacks the authority to pursue, and it's unfortunately --

THE COURT: Or they could pursue it through legislation and Congress; correct?

MR. LOVE HUBBARD: They could certainly propose legislation. They can't do it on their own. And even if, and that's beyond the gambit of what we need talk about here today, your Honor. But it's up to the Court to act as a bullwark to enforce the limits the Constitution imposes on the Executive Branch's improper efforts.

I'm sorry, your Honor, I'm going to turn back to standing briefly. The court recognized that the Child Advocate wasn't a party in the Texas proceeding, had no opportunity to be heard. The district court there explicitly did not consider privacy interests.

The Government in its opposition argues that the Child Advocate doesn't have standing because she is not

24

the person to whom the subpoena was issued.  But Section 346 gives the recipient of the subpoena a statutory mechanism to impose it.  It does not silently extinguish the constitutional rights and authority to challenge unconstitutional action by nonrecipients whose own records are sought.

THE COURT:  And, in fact, my experience is that in HIPAA subpoenas or subpoenas where there is a HIPAA issue the individuals under Rhode Island law have to be given notice by in this case it would have been Rhode Island Hospital, each individual, and an opportunity to move to quash the subpoena and so that's sort of routinely done in state court and in federal court in Rhode Island, and I'm assume in many, many other jurisdictions.  There's no case law that I could find that says you can't move to quash a subpoena for your own information.  The Child Advocate stands in the place of the parents of the children in State care; is that correct?

MR. LOVE HUBBARD:  Absolutely.

THE COURT:  Okay.

MR. LOVE HUBBARD:  And the Supreme Court issued a timely opinion about two weeks ago reaffirming that a subpoena that burdens constitutional rights causes an injury that is more than enough to establish injury in

fact for purposes of standing, and that's the *First Choice Women Resources* case that we cite throughout our brief in reply.

So children who face a dire invasion of their Fourth Amendment right to be free of unreasonable search and seizure and of their Fourteenth Amendment constitutional privacy rights suffer injury in fact from the subpoena.  There can't be any real dispute about that.  And the Child Advocate has independent litigating authority under Rhode Island law to take whatever legal action is necessary to protect the rights of those children.

Multiple courts looking at these identical subpoenas have agreed.  As a district court in Maryland has found, which is patients' case like the interest the Child Advocate is raising, because the subpoena plainly threatens to cause immediate injury to movants' default and concrete right to maintain privacy of their medical records, they unquestionably have standing to challenge.

The Government also raises the objection that the Rhode Island Hospital wasn't present here and so the injury isn't redressable by ordering them to do anything.  That's no longer a concern.  I'd also say the Government's, that the injury is redressable by the

Court ordering the Government, who has been a party the whole time. Quashal is a remedy that runs against the Government and is the proper remedy in this case and that would completely redress the injury caused by the subpoena.

THE COURT: And in your reply brief you state as an alternative ground the Court should modify the subpoena and enter order barring the Department of Justice from receiving, using, retaining, or disseminating patient identifying information or protected healthcare information, including all materials responsive to Requests 11 through 15 and any other materials that identify or reasonably permit identification of Rhode Island's children. And so that seems like the remedy sought there is an alternative remedy that seeks equitable relief.

DOJ has been before this Court the entire time, so certainly I can enjoin the Department of Justice; is that correct?

MR. LOVE HUBBARD: Absolutely. And now that Rhode Island Hospital is also here I think it would be appropriate, given the threat from the Government attempting to seek enforcement elsewhere, to else enjoin Rhode Island Hospital.

THE COURT: Right.

MR. LOVE HUBBARD:  All right.  The Government also raises the collateral attack doctrine in their opposition, and I want to briefly walk through that. First, it's not applicable here because the Child Advocate was not a party to the Texas proceeding.  The Child Advocate, as we've already discussed, had no notice, no opportunity to be heard there.  The Texas court specifically said, quote, Rhode Island Hospital has not shown how it would be harmed, rather than its patients, who are third parties.

Well, those are the patients who are before you through the Child Advocate, and their rights are at issue now.

The Government argues that the Northern District -- that the Child Advocate should have gone to the Northern District of Texas.  It's not clear how that would happen considering that the Northern District of Texas administratively closed the matter the same day that it was opened.

THE COURT:  Within hours.

MR. LOVE HUBBARD:  Within hours.  The Child Advocate was not a party to that case.  It's not clear how we would even appeal if we wanted to, having had no role there.

THE COURT:  Okay.

App. 31

MR. LOVE HUBBARD:  One can't be bound by a judgment *in personam* in a litigation to which she is not designated as a party.  It's a  bedrock constitutional principal.  Beyond that, as we've set forth in our papers, the Northern District of Texas did not have venue to start with.  The collateral attack doctrine simply does not apply when the original court lacks jurisdiction.

THE COURT:  But doesn't the statute give the Department of Justice the right to move to enforce either where the parties are, the records are held, or where the investigation is centered?

MR. LOVE HUBBARD:  It does.

THE COURT:  It's asserted in affidavit and otherwise to this Court that, based on what you said to NYU that this investigation is centered in the Northern District of Texas.

MR. LOVE HUBBARD:  I think, your Honor, what's important about that is the order of events.  If the Department of Justice's theory is correct here that they could generate whatever forum they wanted by issuing subpoenas from D.C. which order production in D.C. to hospitals around the country, losing in motions to quash across the country, and then moving part of an investigation to a district where they think they'll

App. 32

get a more friendly hearing, then the limitations on the jurisdiction are nonexistent.

And you're not writing on a blank slate.  As we cite, the D.C. Circuit set forth eight factors that the Court could look to to see whether this is a place where the investigation is carried on such that venue would have been appropriate.  Those factors include where the hub of national investigative activity took place; and again, here, all of the investigative contacts that Rhode Island Hospital had was with D.C.  The subpoena issued from D.C., the place of production was D.C.  And that's important because the second factor is the agents, the place where the agency made the decision to authorize the investigation.  Again, temporally when the subpoena was issued, where was the investigation carried on.  They can't overcome that factor by subsequently saying oh, we moved the investigation to the Northern District of Texas.  The other factors are where the subpoena is issued.  As we have said, that's D.C.  Correspondence from the agency emanated; again, D.C.  The agency believed that the unlawful actions had occurred; that's Rhode Island.  The documents and witnesses were located; that's Rhode Island.  The headquarters of the subpoenaed company was located; that's Rhode Island.  One state is missing

from all of those factors, and that's Texas.

So the Government has claimed, and I have not seen *in camera* filing, but on the record before me there is zero connection from the investigation, when it was initiated all the way through April 28th with the Northern District of Texas, and so venue was not proper there, and the Court does not have to defer to the jurisdiction of a place where jurisdiction was improper to begin with.

THE COURT:  Under this order, where would these records be returnable now?

MR. LOVE HUBBARD:  I imagine -- because records under the HIPAA subpoena must be within 500 miles of the place where they're from, they would have to be returnable to either Rhode Island or D.C.

THE COURT:  Right.  But if the investigation is in Texas, then I can't order their return to Texas --

MR. LOVE HUBBARD:  Right.

THE COURT:  -- where this investigation is centered.

MR. LOVE HUBBARD:  Right.

THE COURT:  Okay.  You can continue.

MR. LOVE HUBBARD:  It's just not what the HIPAA statute contemplates, your Honor.  If that were the law then there would be no limit on the Government's

jurisdiction to bring an enforcement action anywhere it chooses, and that is not the law.

Next is timeliness. I think we've covered that. If you have any questions about -- there's plenty of case law in our brief about excusing untimeliness even if it were to apply. But the return dates in the statute apply to the recipient of the subpoena and not to a constitutional claimant who never received the subpoena, and that's the Child Advocate.

Again, so we talked about purpose. I think that's the end of the inquiry. There is an improper purpose here, and the Court need to go no further. But if you want to, the next thing is the information they sought relevant to any legitimate investigation and is it reasonably tied to that investigation.

Here, the subpoena targets a category of lawful, state-protected care, and demands children's identities without a viable FDCA predicate or tailoring. All of the various and shifting attempts they've offered to generate an FDCA theory fail. I think the Hospital is probably in a better position to address each of those, but I'm happy to answer any questions you have.

THE COURT: No, that's fine.

MR. LOVE HUBBARD: Okay.

Turning to the privacy interest at issue. As we

said, they are weighty. The records the Department of Justice seeks contain the most intimate details of children's medical health, mental health, gender identity, sexual development, family relationships, trauma histories, and struggles with their sense of self. The subpoena would by definition force the children whose records DOJ would obtain to disclose their transgender status, and that on its own would violate their constitutional privacy rights, as multiple courts in the First Circuit have found, and we cited those to you in our brief.

The disclosure to DOJ is itself the injury in this case. And that's important because even if the improper purpose didn't require quashal as a remedy, though it does, the only way to protect against that privacy invasion is to quash the subpoena in its entirety. Compelled exposure of these children's medical records would chill their exercise of constitutionally-protected rights to seek medical treatment and to associate with providers who would deliver that care. And that is before you consider the Department's explicit threat to share these records with state enforcement agencies in hostile jurisdictions.

THE COURT: Yes, talk to me about that because

HIPAA is pretty clear on that as well.

MR. LOVE HUBBARD:  It doesn't have a limitation on sharing information with other law enforcement agencies.  And as we cited in our brief, the Attorney General in Texas has suggested that he's quite eager to get his hands on this information so that he can potentially prosecute parents who sought this medical care for their children.

THE COURT:  Texas parents?

MR. LOVE HUBBARD:  Potentially.  But, again, people who have moved from Rhode Island -- moved to Rhode Island, you know, who knows what theory that they will generate in terms of threatening.

THE COURT:  Doesn't the *Scrmetti* the case say that states have the right to make these decisions about what healthcare is available in their state and they don't decide it for other states.  Isn't that essentially how I read *Scrmetti*?

MR. LOVE HUBBARD:  The very core of that holding.

And, again, I think the Government's purpose here is relevant to the privacy inquiry because compel disclosure to investigators who have called the care at issue had child abuse would create a massive chilling effect on that patient-physician relationship.

And essentially their, the Government's alternative theory here is they're attempting to generate leads that they could use to find witnesses in another investigation.  Again, imagine the privacy harm if you're a parent whose child got this care and thinks now the Department of Justice is going to send federal investigators to my house to ask questions about that care so that it can pursue undefined investigative ends in the Northern District of Texas.  That is an injury right now and the injury comes from the disclosure to the Government, and the remedy for it is quashal.

The notice of privacy practices argument the Government raises is I think a nonstarter.  A privacy notice says that records may be disclosed in response to lawful process.  It does not waive constitutional rights, and it does not authorize an unlawful and pretextual subpoena.

THE COURT:  Let's just clarify.  Because we are in the First Circuit, what is the status of the right to informational privacy in the First Circuit or to medical privacy; and because it's grounded in individual privacy interests, I'm assuming, --

MR. LOVE HUBBARD:  Absolutely.

THE COURT:  -- how does the Court get to all of the minor patients rather than just the DCYF children?

MR. LOVE HUBBARD:  So the privacy rights of the DCYF children are necessarily embedded in this broader patient population, right, and so if the Court were to order relief that went only to DCYF children's records, that itself would risk exposure of rest of the children at issue because the Hospital would have to go through, you know, imagine the administrative burden.  Frankly, that's their issue, not mine.  But you can imagine the administrative burden of trying to go through and work with the Government, who is hostile to this care, and the Child Advocate to specifically identify only the children whose records would be at issue in that order. That creates and reinforces the disclosure injury that I've been talking about.

THE COURT:  And what would be the timeframe? For example, if somebody was in their parents' or their guardians' care and then was in DCYF care, maybe went back to their patients' care or aged out of the system, who, would the Child Advocate -- is allowing this relief only to the Child Advocate's children something that would require this, a determination as to each patient when decisions were made, who was responsible for their care?

MR. LOVE HUBBARD:  Absolutely, your Honor.  It's entirely impractical.  And before that quashal is a

remedy that runs against the Government because the defects that we're talking about, the improper purpose, they infect the entire subpoena. And so before you even again to the administrative burden and practical impossibility of carving out that relief the -- in order to remedy the Government's error here you have to wash the entire subpoena.

THE COURT: And your argument is it doesn't matter what the Northern District of Texas did because the Child Advocate wasn't there, wasn't given notice. We can get to whether Rhode Island Hospital had an opportunity there or not; but with respect to your client, excuse me, there was no opportunity to be heard in Texas.

MR. LOVE HUBBARD: Correct.

THE COURT: Okay.

MR. LOVE HUBBARD: Your Honor, this case is about whether the federal court can use its administrative subpoena power to demand the identities and complete medical records of vulnerable children as part of a stated campaign to end lawful medical care the Government disapproves of. Seven courts have said no. The Government doesn't really engage with any of those courts in its opposition. The Government's stated purpose here was an improper one. It has stated

so publicly, repeatedly, unambiguously, and brazenly.

The constitutional privacy interests of Rhode Island's children are real and weighty and confirmed by State law.  This Court unquestionably has jurisdiction to adjudicate them; and for all the reasons we've talked about needs not defer to the Northern District of Texas.

The Child Advocate, therefore, respectfully asks this Court to the quash this subpoena in its entirety and protect the constitutional rights of the children the Federal Government is targeted here, and, in addition, to enjoin the Government from taking any actions to enforce the subpoena elsewhere.

THE COURT:  Okay.  Now, just a question and I think it's probably tangential, but are you aware of any specific holding that an administrative subpoena is final agency action for purposes of 702 of the APA.

MR. LOVE HUBBARD:  I'm not off the top of my head, your Honor.  The cases we've cited about that issue are that even if there's not an APA cause of action specifically, the APA provides relief for constitutional actions when there is no other relief otherwise, and that's exactly the situation here.

THE COURT:  Okay.  Thank you.

MR. LOVE HUBBARD:  Thank you, your Honor.

App. 41

MR. OLSHAN:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. OLSHAN:  Eric Olshan appearing on behalf of Rhode Island Hospital.

I think I would like to start with how we got here, Judge.  As the Court is the aware, the Hospital was issued an Administrative Subpoena by the Department of Justice July 9th of last year.  The return date was August 7th.  Rhode Island Hospital retained outside counsel.  Within a couple weeks we engaged with the Government.  We are here all those months later because we relied on the conduct of the Government in how they interacted with Rhode Island Hospital with respect to compliance with the subpoena.

As the Court is well aware, subpoenas are issued all the time, whether it's a grand jury subpoena, an administrative subpoena.  Oftentimes the language in those subpoena attachments is quite broad because the Government doesn't necessarily know what things specifically to ask for, assuming they have a valid basis to issue the subpoena at all, and so that sparks negotiations and back and forth between the subpoenaed entity or individual and the Government.  That is sort of the normal course, and that is how we pursued our conduct on behalf of the Hospital in this

investigation, assuming that we were dealing with a counterparty that was acting in good faith.

We made a production at the Government's request on August 7th, the return date. And I would note for the Court that we never heard that there was anything insufficient about that until they filed their motion to compel in the Northern District of Texas a couple weeks ago.

THE COURT: Well, you were still negotiating about search terms; is that correct?

MR. OLSHAN: Eventually we were, absolutely. At the time we made that initial production, that was a couple weeks after the subpoena was served. We were not yet negotiating search terms and that related to one of their requests for marketing communications involving pharmaceuticals.

THE COURT: Right. So they didn't specifically engage with you about each of the items that they requested; --

MR. OLSHAN: Right.

THE COURT: -- I apologize. And so specifically 11 through 15, there was no engagement with them on that; is that correct?

MR. OLSHAN: That's exactly right, your Honor. So obviously at the center of our objection in the

Child Advocate's and the litigation around the country is the core privacy interests of the patients and their families at stake here.

I will tell the Court that that topic did not come up in our negotiations.  We were talking about marketing communications, and as we've laid out in our brief, the cadence of our conversations with the Government was staggered.  Usually in these situations the Government is driving expectations; it's their process, they issued it.

Here, we would have starts and stops, and so there were multiple conversations not about Requests 11 through 15.  They were never raised by the Government. We were talking about this other topic.

THE COURT:  And were you always communicating with the same person from the Department of Justice?

MR. OLSHAN:  Primarily.  The first two calls I believe, your Honor, Mr. Campbell was on those calls. But our subsequent conversations, including the one that occurred in the e-mail exchange that the Court referenced starting on April 28th was with primarily two trial attorneys.  I believe one's a trial attorney; one might be a supervisor in what was the Consumer Protection Branch that is now part of the Informative Enforcement and Litigation Branch, I believe it's

called, which is still part of the Civil Division.

But over time we were dealing directly with two individuals primarily in our, I'd say, last four to six calls, neither of whom is here.  So our --

THE COURT:  Okay.  And we don't have an affidavit from any of those; we just have the e-mails.  Correct?

MR. OLSHAN:  That's correct.

THE COURT:  Okay.

MR. OLSHAN:  So our conversations over these periods of months in 2025, we were focusing on our efforts to collect e-mail communications that may be responsive to the marketing request as it relates to pharmaceutical companies.  Never at any time did we hear your so-called grace period is running out, we are not happy with the pace of production.  We didn't have any information from the people at the other end at the Department of Justice that anything like what happened a couple weeks ago was going to happen.

And so you get to January, and the Court is aware from the e-mail chain and the briefing on this, you get to January.  We had a conversation with an attorney from the Consumer Protection Branch, or what is now EALB.

THE COURT:  Can you tell us who that attorney

was.

MR. OLSHAN:  His name is David Gunn.

THE COURT:  Okay.

MR. OLSHAN:  Our conversation with Mr. Gunn where we talked about providing search terms and in anticipation of providing a production.  The next week we provided those search terms; the Court is well aware of this.  We didn't hear back even to acknowledge receipt of those search terms, let alone tell us, hey, thank you for sending us the search terms, we've got 15 more we think you should add or 30 of them we don't care about any hits on those; which is sort of the typical back and forth in that context.

THE COURT:  In a typical informational discovery exchange, correct, or a subpoena.

MR. OLSHAN:  Sure.  Absolutely right.  And again, that is typical when you have a very broadly worded subpoena.  And here, as the Court again is well aware, this isn't just a broadly-worded subpoena.  This is an exceptionally expansive subpoena; not just Requests 11 through 15, but virtually everything, gets into the innermost workings of the operation of this Hospital that's trying to provide care for this very vulnerable patient population.

So, again, in late January offered to provide

search terms, we did; they didn't respond. Some 12 weeks passed until April 28. We had the e-mail from Mr. Gunn, that is in the record, saying that they had not heard from us since the search terms we sent and they would request a status. So we responded next day, which was the 29th of April and said sure, the rest of this week is not great, how about Monday. We didn't get a response about scheduling that status call.

The next communication we received, and the Court was exactly right, this happened at 6:10 p.m. Eastern time, it was Eastern time on Thursday April 30th, responding to our e-mail about scheduling the conference that the Department had requested, saying no need for the call at this time, here's what we filed.

THE COURT: And here's the order that we got; right?

MR. OLSHAN: The order we got the next day.

THE COURT: When was the order ordered in Texas? Texas CM/ECF doesn't allow time. We do.

MR. OLSHAN: So that is a little bit of a mystery here, your Honor. So the order is dated the same day that the motion to compel was filed. So I guess technically it must have been within a matter of hours because the day ended at some point.

THE COURT:  Well, it had to be, I would imagine it had to be by 5:00 Texas, Northern District of Texas time, which I think that's an hour different from Rhode Island.

MR. OLSHAN:  Correct.

THE COURT:  So that would have been 6:00 Eastern time; correct?

And the Government can correct me if I'm wrong about that, but...

MR. OLSHAN:  That's correct, the Government would presumably know when they received the order.  It was docketed the next day before we had even entered an appearance in the case.  So we actually found the order granting the relief the Government sought essentially *ex parte* before we were even appearing in the case.

But the Government would know whether that order was actually signed before the close of business on Thursday the 30th, which would mean not only did we not get notice that there was a motion to compel until after the close of business Central and Eastern time, but that the order granting it was before we ever received notice.  I'm leaving open the possibility, your Honor, that it might have been signed in the evening after we got the e-mail from Mr. Gunn attaching the motion, but --

THE COURT:  Certainly the Government can respond to that.

MR. OLSHAN:  Right.  From our standpoint the motion was, and the record is clear, the motion was filed and granted the same day, which is the genesis of our due process argument.

THE COURT:  Okay.  Let's talk about that.  I want to -- a couple of things.  So you were in these negotiations with the Department of Justice, and I recognize that this is typically how this works in these cases.  But there was nothing preventing Rhode Island Hospital from filing a motion to quash and saying to the court hold off on this, we're negotiating.  Is that correct?

MR. OLSHAN:  That's true, your Honor, it is. It's an escalation that based on the tenor of our communications -- again, our reliance on the conduct of the Government we didn't think was necessary at the time.

Now, the other thing we didn't know as we were -- well, eventually we knew this -- is that now it's public because these matters have been unsealed. Other subpoenaed entities receiving the same exact subpoena did go to court under seal:  Boston Children's, Children's Hospital of Philadelphia,

Seattle Children's, QueerDoc, Colorado Children's, that was all under -- pardon me?

THE COURT:  Los Angeles, maybe?

MR. OLSHAN:  I believe the Los Angeles action, CHLA, was pursued by patients.

THE COURT:  Correct.  Okay.

MR. OLSHAN:  But my point is this is happening in parallel and so as we're negotiating and deciding next steps, again reacting to the conduct of the Government.  Again, they have not brought up the most sensitive category, and as the Court knows from our briefing, the Government voluntarily agreed to limitations from at least three subpoenaed entities.

THE COURT:  And there's nothing in the record that indicates that they gave that information to the Texas judge.  In fact, there's an argument that there was a misrepresentation to the Texas judge; isn't that correct?

MR. OLSHAN:  I am not aware of anything in the record in the Northern District of Texas that indicates they told that court that they had agreed to limitations as to deidentified records, no, your Honor.

THE COURT:  Okay.  And I think they're saying the deidentified records in their response in Texas they say, and actually Lisa Hsiao says in her

publicly-filed affidavit that, (Reading) Health benefits programs tied to identified patients could provide additional information, including claim records, creating a reinforced evidentiary record.  And then the Government goes on to say in its brief, (Reading) In sum, without this information the Government cannot fully determine the scope of violation, identity patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 USC 333(a)(2).

So is it arguably the Texas judge wasn't informed that they made compromises with other hospitals to receive deidentified information and, in fact, I would read that to say that they misled the Texas judge on that.

MR. OLSHAN:  I won't disagree with the Court.

From my client's standpoint, from Rhode Island Hospital's standpoint, as you can imagine, Judge, the recitation of the series of events between issuance of the subpoena and April 30th when the motion was filed is something that we object to vigorously.  It is not an accurate recitation.  It makes it sound like a subpoena was issued, we dropped off a six-page document, we said see you later, and then nothing

happened and they decided to go to court.

That court was not made aware of the fact until we moved to the stay the court's order, and the court there had denied our motion, but we made the court aware that there was a series of events literally in the two days before they moved to compel before that court.

THE COURT:  Yeah.

MR. OLSHAN:  So here we are, your Honor.  The Child Advocate, after the court entered the order, we had no opportunity to be heard.  And we've cited Fifth Circuit cases, First Circuit cases, Supreme Court cases making clear that that is a fundamental due process violation, that the opposing party has to be given the opportunity to be heard prior to enforcement.

THE COURT:  The Department of Justice is saying, hey, this is a collateral attack by both Child Advocate and by Rhode Island Hospital.  Can you address Rhode Island Hospital's argument with respect to why the Court should not consider this is to be a collateral attack on the Northern District of Texas order.

MR. OLSHAN:  Absolutely, your Honor.  One thing I would say is if the collateral attack doctrine does not apply, then it is a direct action, if you will, against that order because our position is and why

we're before this Court is because it's void.  And so there's a case that we cite, it's *Ash v. McNamara,* it's a First Circuit case that says when the record of a proceeding, quote, established very clearly that due process of law had been denied, a court would have been empowered to entertain the collateral attack.

And essentially that's what we're articulating in our briefing, Judge, is that by the district court not giving us any opportunity to be heard prior to enforcement, which could have been immediately, could have been a couple of hours, we weren't heard; that's a fundamental due process violation which allows us to come to court.  I agree with Mr. Hubbard that with respect to the Child Advocate they're not similarly situated, they were not a party to the matter that led to that order that way that we are.

THE COURT:  How do I consider the lack of sort of a full disclosure in Texas to the judge there what had gone on between July of 2025 and April 29th of 2026 when I decide -- does that impact the determination as to whether Rhode Island Hospital was denied due process?

MR. OLSHAN:  I think it does because one of the things that we would be permitted to have done if given the opportunity to respond on the merits to the motion

to compel is exactly that, lay out that this is what has been happening since the subpoena was issued July 9th. And the court, this is in our briefing, that the date on the order the court signed there is actually wrong. It says that the subpoena was issued July 3rd. It was issued July 9th.

All of that, your Honor, would be hashed out if we had been given an opportunity, including this correct series of events.

THE COURT: And why isn't the proper order of operation, so to speak, a motion to reconsider in Texas before that judge?

MR. OLSHAN: Your Honor, given what happened in the immediate ordering -- and actually now this has been ratified by the district court there in denying our motion for a stay -- that essentially the court viewed any argument as, or any opportunity for us to be heard on behalf of Rhode Island Hospital as futile. And so the court there, in issuing that order immediately, our assessment was the court's mind was made up, irrespective of whether we had a chance. We obviously disagree with the court. And so given the order requiring full compliance with the subpoena, which the Government knows is not possible, we chose to ask the court to stay while we appealed his order. The

court denied that over the weekend, I believe Sunday night, and so now we were in the Fifth Circuit which --

THE COURT:  They denied it, but do you agree with Mr. Love Hubbard that they've also stayed the part of the subpoena that deals with the informational privacy Requests 11 through 15?

MR. OLSHAN:  I think you could read it that way. I don't know how the Government reads it, your Honor.

THE COURT:  I think it's a pretty clear reading from the order from the judge in Northern District of Texas.

MR. OLSHAN:  Even if there is a stay as to let's say categories or Requests 11 through 15 your Honor, it only lasts until the Fifth Circuit acts on our motion for a stay pending appeal.

THE COURT:  Right.

MR. OLSHAN:  So, and frankly for all we know that could have happened already during this hearing because the government filed their response noon Central time in the Fifth Circuit.  The Fifth Circuit could act at any moment.  So in theory, yes, your Honor, but as practical matter the court could act tomorrow, the court could act the next day; and given the series of events that led us here to this two-week window -- and I would be curious whether any subpoenaed

entity has (1) made full compliance, made full production and (2) done it on a two-week timeframe after the Government had led them to believe that their conversations were an appropriate pace.

THE COURT:  The record in Texas that goes up to the Fifth Circuit is not necessarily going to be complete; is that correct?  That there's no motion to reconsider.  So your arguments that are here are not before the Texas -- the Fifth Circuit Court of Appeals.

MR. OLSHAN:  They're only in front of the Fifth Circuit under the likelihood of success prong of the stay analysis.  This is not the full-throated articulation that you would -- that we have preferred on direct appeal, excuse me, on reconsideration or on, if we had been given an opportunity to actually respond.

THE COURT:  And because his order denying the motion to stay says that your, any arguments you made would be futile, it's Rhode Island Hospital's that it would be a waste of energy and resources and the court's time, I would assume, and DOJ's time to file a motion to reconsider in Texas.

MR. OLSHAN:  Certainly now, your Honor, now that the court has entered an order saying that based on what the Government's one-sided version of events lays

out and their one-sided legal arguments, and notwithstanding that there are seven reasoned decisions from district courts around the country, our arguments are few futile, yes.

THE COURT:  Thank you.

MR. OLSHAN:  And we're always interested in conserving judicial resources if we can.  I should have said at the outset, Judge, thank you for letting us appear at this hearing today.  Given the hour obviously there's significant time pressure that Rhode Island Hospital is facing.

And so I've laid out why from a due process standpoint we think we have a strong argument not only in the context of an appeal in the Fifth Circuit, but why this court can entertain our motion to quash alongside the Child Advocate's motion to quash.

The Child Advocate obviously is representing the interest she has on behalf of the children she speaks for, and I join Mr. Hubbard and the Child Advocate's arguments as to quashal across the board for this document.  Obviously some of those arguments the Government's raised as to the Child Advocate maybe do not apply to Rhode Island Hospital.  We are the subpoenaed party.  We can ask this Court to quash across the board.  That is what we are seeking at this

point.

And when the Child Advocate filed we had to -- we made the decision we had to be here in front of this Court.  Rhode Island Hospital cannot be on the sideline while these issues that not only impact this extremely vulnerable patient population, as Mr. Hubbard articulated, but the operations of the Hospital, your Honor.  From any hospital's standpoint, the knowledge that the Government could come along, the Federal Government, and obtain the most sensitive patient records in support of what courts have determined is invalid and inappropriate investigation is something that cuts at the core of these hospitals.  If patient populations know that, it might be this vulnerable patient population today; it's going to be another one down the road.  That's going to affect the ability of the Hospital to operate.

THE COURT:  Let me ask you a question, though.  If I agree with you and quash the entire subpoena, what's the effect on the order in Texas?  Does it make it a nullity because there's no subpoena for them to order compliance with?  What is the practical effect and what is the procedural sort of impact?

MR. OLSHAN:  I think the legal effect would be that this Court would be ruling that that order is

essentially void because of the due process issue.

We would ask the Court to inquire when the Government speaks if this Court were to enter order quashing the subpoena as issued to Rhode Island Hospital, is the Government going to ask the court in the Northern District of Texas -- this is assuming there's no stay.  We don't know if there's a stay; this issue potentially goes away.

THE COURT:  Uh'huh.

MR. OLSHAN:  Are they going to go to the Northern District of Texas and ask to hold Rhode Island Hospital in contempt in the face of an order that says the subpoena is quashed?  And if they will not commit to do that, your Honor, we would ask this Court's order not only quash the subpoena, --

THE COURT:  But enjoin.

MR. OLSHAN:  -- but also enjoin Rhode Island Hospital from producing responsive records to the Government, and from the Government enjoining the Government from collecting or taking actions or collect --

(Indecipherable crosstalk)

THE COURT:  -- to receive responsive records; right?

MR. OLSHAN:  Exactly.

App. 59

THE COURT:  Okay.

MR. OLSHAN:  I would hope that the Government -- in the face of any order this Court issues narrowing or quashing, which we're asking for -- would agree not to seek that relief in the Northern District of Texas, but only they can answer that question.

I do want to take a few minutes to talk about the FDCA.  The LAMBDA Legal Education Fund, your Honor, their amicus brief has a very good recitation of the Government's shifting articulation of what they are investigating under the FDCA.  Is it I believe pages 24 through 27 of their brief which is docket number, one moment, Docket 15, I believe, in this matter.  It lays out in detail the sort of shifting use of the terminology from the FDCA, and that's even happened with respect to Rhode Island Hospital.

The affidavit that the Court quoted from for Ms. Hsiao that was filed in the Northern District of Texas, this is Document 1-1 from the Northern District of Texas case 4:26-MC-6, says in paragraph 3, this is a sworn declaration, "EALB-ES" -- that's this office that is based in Washington, D.C.

THE COURT:  Paragraph 3, is that what you're saying?

MR. OLSHAN:  Correct, your Honor.

THE COURT:  Yes.

MR. OLSHAN:  "...is currently conducting an investigation of potential violations of the Food, Drug, and Cosmetic Act, FDCA, relating to the on- or off-labeling use by manufacturers and distributors of drugs, including puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called gender transition."

So the language in that paragraph, your Honor, speaks about investigations of on- or off-label use by manufacturers and distributors.

Rhode Island Hospital is neither a manufacturer or a distributor.  And as the FDCA makes clear, off-label use is not prohibited.  It's certainly not prohibited as to Rhode Island Hospital or the clinicians who prescribe these medications.

THE COURT:  Right.  Do you have clarity on what the DOJ says it's investigated?  Because I read that too and it indicates that Rhode Island Hospital is certainly not -- it can't be responsible for misbranding, which I think is another thing that they say.  And so you're not a manufacturer.  You're not liable for any criminal activity or for off-label use, and so you also -- they also cannot enforce sort of these laws that are misbranding laws against you.

Did you get any clarity from people you were working with with the Department of Justice as to what they specifically were investigating?

MR. OLSHAN:  No, your Honor.  And it is confusing even in this litigation because I believe the articulation is one way in response to, I'm sorry, in this declaration that was submitted in the Northern District of Texas.  It's articulated differently in the Government's response to the Child Advocate's motion to quash, and it makes it sound like in their briefing that there actually could be some kind of liability as to Rhode Island Hospital, which clearly this declaration does not support.

THE COURT:  Right.  And it's under oath, this declaration, it's an affidavit of Lisa Hsiao.

MR. OLSHAN:  It is.  And each of the -- I believe maybe with one exception, your Honor, Ms. Hsiao has submitted a declaration, a declaration in every one of the litigated cases that are unsealed.

But I would commend the Court to the brief by LAMBDA Legal where it kind of lays out each of these permutations.  And this is relevant because it gets to the argument of what is the -- whether there is an improper purpose and any bad faith in this investigation.

The way that we read what we think is their theory is that there cannot be criminal liability because -- and I'm going to do my best here, Judge. Physicians prescribe these drugs lawfully off label. FDCA protects that.  Supreme Court said that that is the law of the land.  The Department of Justice has taken that position in other litigation.  It's not a controversy statement that the doctors routinely prescribe off-label.

THE COURT:  I think Wegovy and whatever the GLP-1 drugs are, that are being prescribed off-label for everyone.

MR. OLSHAN:  That's right.

THE COURT:  Not everyone; I assume some people are legitimately taking them for diabetes.

MR. OLSHAN:  But a lot of off-label prescribing. I believe one of the briefs, it might be the Child Advocate's reply estimates -- or maybe the state Attorneys General, I apologize -- 20 to 50 percent of all drugs are prescribed off-label.  In some areas of medicine I believe the entire standard of care involves using a drug for an off-label purpose or, excuse me, prescribing it for an off-label purpose.

So what one is left to see is that the Department of Justice is kind of bootstrapping a

shifting theory about why there is statutory basis for the issuance of these subpoenas under 3486 so that they can justify what their own statements reflect is a desire to end gender-affirming care.  And as this Court intimated, there are other ways -- I'm not a doctor, I don't know if anyone in this courtroom is a doctor; but the Government is certainly not doctors.  If they do not like the way that certain areas of medicine is practiced, they can that that up with state legislatures, they can take it up with licensing boards.

But you do not carry out what appears to be based on public reporting essentially a nationwide dragnet through criminal legal process to collect the most sensitive patient records of what could be tens of thousands, maybe more, of the most vulnerable children in the United States.

So when the Court kind of tries to parse each of these FDCA theories, we would argue that's what left, is that they have not articulated a valid legal theory under the FDCA, and what they're trying to do is say that because the original packaging that the manufacturers produced and the instructions on it for use do not match with how the drug is actually used when prescribed off-label by a physician, that somehow

establishes some kind of conspiracy to distribute or promote in on off-label manner.

THE COURT:  Okay.  Who's -- I'll ask the Department of Justice that.  They can answer that.

MR. OLSHAN:  So again, your Honor, under the FDCA our view as articulated in our brief and as ratified by some of the other courts or all of the other courts prior to the Northern District of Texas' ruling, there is not a lawful statutory basis, and that's independent of the evidence in the record of bad faith and improper purpose.

And I will add, your Honor, when the Department moved to compel, I'd also put on the record there is a Local Rule in the Northern District of Texas, I believe it's Local Rule 7.1 that requires conferral before filing a motion to compel.  There was obviously no conferral here.  They do style it as a petition, though in their actually pleading they say that they are seeking to compel the records, and I believe the judge's order, excuse me, denying our motion for stay refers to it as a motion to compel.  But we certainly did not engage in any conferral prior to their filing, as the record makes clear.

But one of the things, you know, we're left to consider is why Rhode Island Hospital, and one thing

that is relevant to that as it relates to this improper purpose and bad faith analysis is that one of the officials involved in this litigation has actually affirmatively sued Rhode Island Hospital and providers at Rhode Island Hospital in the years leading up to now.  So Mr. Campbell, prior to joining Department of Justice, initiated litigation in state court and federal court in Rhode Island against Rhode Island Hospital and the some of its providers and has been on record.  I believe the FTC hearing that Mr. Hubbard mentioned, and the Court has the transcript, that's where Mr. Campbell appeared and said that they're working on this with respect to some argument of ending gender-affirming care by going after providers.  That should be relevant to this Court at least as it relates to Rhode Island Hospital because we're left wondering given the nature of our communications with the Government, how we wound up in this situation that we're currently in.

If the Court will allow me one minute to look at my notes.

(Pause)

MR. OLSHAN:  One other thing that relates to the way that the Government has articulated what they are investigating is they talk about false billing.  False

billing is not a viable theory under FDCA.  That would be healthcare fraud theory.  And so although Ms. Hsiao's Declaration says they are investigating violations of the FDCA, I notice in the Government's brief they say that they are investigating, among other things, violations of the FDCA.  So it is unclear unless that was an inartful turn of phrase whether or not the representation that this is just an FDCA investigation is accurate or if it has expanded to now encompass billing allegations which really sound in healthcare fraud, Judge.

THE COURT:  And that's the other question.  Have you dealt with anybody from the Criminal Division DOJ or you're only dealing with the Civil Division with respect to this subpoena?

MR. OLSHAN:  It's a bit complicated because there's been some reorganization at the Department of Justice.

THE COURT:  I see.

MR. OLSHAN:  As I understand it, and the Government can speak to this.  The Consumer Protection Branch which was a part of the Civil Division, but actually had a civil and criminal mandate, so would be criminal case coming out of that part of the Civil Division, has been moved or a lot of it has been moved

over to the Criminal Division of main Justice; although, as we understand it, the lawyers from that office who are working on this particular investigation are not in the Criminal Division, they have stayed or been seconded or detailed back to the Civil Division.

THE COURT:  And just so that we're clear, in Texas Ms. Hsiao signed her affidavit as Acting Director Enforcement and Affirmative Litigation Branch, Civil Division, United States Department of Justice.  So that answers my question, thank you.

MR. OLSHAN:  That is accurate.  And I did want to make a point about so it's crystal clear on the venue question, your Honor.  At no time from when we -- the subpoena was served on Rhode Island Hospital, until the court entered the order on April 30th granting their motion to compel, were we in touch with anyone in Texas.  Every single person we spoke to was an attorney, whether there was a career person or a political appointee at main Justice in Washington, D.C.  No communications with anybody in Texas.

Unless the Court has any other questions, I appreciate Court's time.  And if the Court would allow, depending on what the Government has to say, I would imagine Mr. Hubbard may want to be heard again, and I would like to as well.

THE COURT:  Of course.

MR. OLSHAN:  Thank you.

THE COURT:  We are going to take a 10-minute recess to allow the stenographer to rest her fingers for a bit, so we'll be back in 10.

(Recess)

MR. MAYERS:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. MAYERS:  I tend to speak fast, so let me know if there's a problem.

THE COURT:  Yes, just take a deep breath in between.

MR. MAYERS:  Yes.

THE COURT:  You know, it is hard for her to get the record and I tend to interrupt, so, I also speak fast.  So whenever you're ready.

MR. MAYERS:  May it please the Court.  The motion before the Court today, I'd like to briefly renew our motion to transfer.  There a few factual developments that are relevant to the first-filed rule --

THE COURT:  Uh'huh.

MR. MAYERS:  -- that have taken place in the interim between your Honor's ruling and present.  First, of course, the fact that Rhode Island intervened

App. 69

and so there's --

THE COURT:  I've denied that motion, --

MR. MAYERS:  Okay.

THE COURT:  -- and I've articulated the reason. The first-filed rule doesn't apply when Rhode Island Hospital wasn't before the court in Texas.  The fact that they've now been forced to intervene here and in Texas doesn't bootstrap you into the first-filed rule.

MR. MAYERS:  Understood, your Honor.

So next I'll turn to two threshold arguments that we made that you discussed with the person on the other side; first, standing; and second, the collateral attack doctrine.

THE COURT:  Okay.

MR. MAYERS:  Both of those in the Government's opinion confirm that any relief --

(Court Reporter requests pause)

THE COURT:  The Government submits that both of those doctrines confirm that any relief the parties seek should be in front of the Northern District of Texas and not this Court.

So first, standing.  The Child Advocate talks about injury in fact.  Your Honor, we don't dispute injury in fact here as to the Child Advocate's ability to raise the interests of DCYF.

THE COURT:  You do, or you do not?

MR. MAYERS:  We do not.

THE COURT:  Okay.

MR. MAYERS:  So with respect to the Child Advocate in DCYF custody, we agree the Child Advocate can raise those interests.

THE COURT:  Okay.  We're going to get this to later, but you should think about how on earth we would decide who is in DCYF custody and when.  And while we're on the subject, what made the Government choose January of 2020 through the present day, which I assume in any present day.

MR. MAYERS:  Your Honor, that's just the standard term for a subpoena of this nature.

THE COURT:  Six years?  Five years and three months, four months, five months?  That's your standard?

MR. MAYERS:  Yes, your Honor, as far as I'm aware that is the typical just dating that we would use in a subpoena like this.

THE COURT:  Okay.

MR. MAYERS:  I'll briefly discuss standing and then we can go to any questions your Honor had.  But our focus in our brief in any case is redressability, so the point to meet redressability must show that a

favorable resolution of her claim likely address the professed injury.  We submit that's not true here.  Regardless of quashal or injunction, which we maintain would not be permissible on a --

THE COURT:  Why isn't it?  Why isn't the redressal here?

MR. MAYERS:  Your Honor, I think regardless of your Honor's choice of remedy, the Northern District of Texas' order would still stand.  It would still require --

THE COURT:  Not if I enjoin DOJ from receiving any documents.

MR. MAYERS:  Your Honor, the order compelling the Hospital to turn over those documents we would submit would still stand.

THE COURT:  Okay.  But you understand, of course, that you couldn't receive them.

MR. MAYERS:  I don't know where I -- it would be complicated.  I don't know where Rhode Island would send them.

THE COURT:  Where would you -- well, they wouldn't send them to Texas because it's more than 500 miles.  Where are you from?

MR. MAYERS:  I'm from Washington, D.C.

THE COURT:  Okay.  And your co-counsel?

MR. MAYERS:  Washington, D.C. as well.

THE COURT:  And also at counsel table, Ms. Zurier is Rhode Island; correct?

MR. MAYERS:  Yes.  Rhode Island, yes.

THE COURT:  Where is the Northern District of Texas person?

MR. MAYERS:  There is no lawyer from the Northern District of Texas present in the court.

THE COURT:  Why not?

MR. MAYERS:  Decided that I would come argue this motion, your Honor.

THE COURT:  Uh'huh.  Okay.  Go ahead.

MR. MAYERS:  Your Honor, we do think there's a complication as to redressability for the reason I stated given the fact that the Northern District of Texas order would remain on the books regardless.

THE COURT:  Okay.  Now, you heard Mr. Love Hubbard refer to the NYU press release; correct?

MR. MAYERS:  Yes, your Honor.

THE COURT:  And that press release, which I'm getting a copy of now, dated -- I don't know when it was dated, but it says that on May 7th NYU was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas, and it goes into the

request.

So I'm assuming that the fact of a grand jury in the Northern District of Texas is not, is no longer a secret if you're issuing subpoenas from that grand jury; correct?

MR. MAYERS:  Your Honor, we acknowledge that NYU Langone has put that release out.

THE COURT:  What, you're disputing it?

MR. MAYERS:  No.

THE COURT:  Okay.  So that happened.

MR. MAYERS:  Yes, your Honor.

THE COURT:  Okay.  When was that grand jury convened?  What specific date?

MR. MAYERS:  Your Honor, I can't come up with the exact specificity as to the date.  I believe that we can only speak to the extent of what's in the press release of NYU Langone, it's in the public record. Your Honor, we submitted the *ex parte* Hsiao declaration as well.

THE COURT:  But that doesn't -- okay.  I haven't ordered and I'm going to order as a result of the fact that now this has been released that you provide a copy of that affidavit to opposing counsel, and you can do whatever you need to do to redact it, but redactions need to be for things like entities being investigated.

MR. MAYERS:  Understood, your Honor.

Second, your Honor, there was a discussion of the collateral attack doctrine.  We think that it applies with respect to both parties, most apparent with respect to Rhode Island Hospital.

THE COURT:  Okay.  Let's talk about the collateral attack doctrine, okay?  So you sought enforcement of a subpoena against Rhode Island Hospital in Texas.

MR. MAYERS:  That's correct.

THE COURT:  Instead of the Washington, D.C. court which right outside your door; right?

MR. MAYERS:  Yes, your Honor.  We moved there because that's where the investigation is being carried on.

THE COURT:  And that's where you've represented to this Court and it's been represented under oath that that has been, not just is now, but has been the center of the investigation; is that correct?

MR. MAYERS:  Your Honor, can you point me to a specific reference that you're pointing to.

THE COURT:  Looking at Ms. Hsiao's affidavit that's attached to your filing in Texas, and she says, she says on page -- nope, a different one.  Well, I'll find that and we can get back to it.

But it is it your representation then that it hasn't always been centered in Northern District of Texas?

MR. MAYERS:  Your Honor, it's our representation that when our petition was filed that that was where the investigation was being carried on.  That is the locus or -- the focus, excuse me, of subsection (c) for the purposes of where venue is the proper for a petition to enforce to be filed.

THE COURT:  Did you inform the Texas court about the back and forth that you had with Rhode Island Hospital over 10 months, or did you simply just tell them they had only given you six pages?

MR. MAYERS:  Your Honor, I believe we -- the focus of representation was on the production.

THE COURT:  So you did not, you did not inform them of the actual facts; correct?

MR. MAYERS:  I wouldn't go that far, your Honor.

THE COURT:  Well, tell me what you told Texas, because I have your filings here, and unless you had *ex parte* communications I know what you told Texas.

MR. MAYERS:  Yes, your Honor, I would be happy to.  So I'll point the Court to paragraph 46 of the Hsiao Declaration.

THE COURT:  The first Hsiao Declaration.

MR. MAYERS:  Yes, the first one, yes.

THE COURT:  Uh'huh.

MR. MAYERS:  It says the return date, you know, I can read it for your Honor, but that details the --

THE COURT:  (Reading) Early conversations with Rhode Island Hospital, the Government communicated that it would be willing to receive documents responsive to the subpoena past the return date but that it did not expect to extend the grace period beyond reason.

Is that accurate?

MR. MAYERS:  I was not on the --

THE COURT:  Who made those representations to Rhode Island Hospital?

MR. MAYERS:  I believe it was on that phone call or e-mail, but I believe a lawyer from I believe the then-Consumer Protection Branch, which is now the Enforcement and Appropriate Litigation Branch.

THE COURT:  Who?

MR. MAYERS:  I can't answer that, your Honor, --

THE COURT:  You don't know?

MR. MAYERS:  -- who exactly that was.  Not that lawyer that's referred to here.  It's one of the member of the Enforcement Litigation Branch team, but I can't confirm which one it was at this time.  I'd have to get

that information --

THE COURT:  So when Lisa Hsiao made that representation, she had information saying that that was the communication with Rhode Island Hospital; correct?

MR. MAYERS:  Yes, that communication was had, yes, your Honor.

THE COURT:  Okay.  But she said that we "did not expect to extend the grace period beyond reason;" correct.

MR. MAYERS:  That is what Ms. Hsiao said, yes.

THE COURT:  Under oath.

MR. MAYERS:  Yes, that's what Ms. Hsiao said.

THE COURT:  I'm sorry?

MR. MAYERS:  Yes, that is what the declarant said.

THE COURT:  Is that true?

MR. MAYERS:  I would have no reason to believe it's not, your Honor --

(Indecipherable crosstalk)

THE COURT:  So if Rhode Island Hospital is saying we had ongoing conversations, then they're misrepresenting the facts.

MR. MAYERS:  I don't think that the fact of ongoing communications is inconsistent with what

Ms. Hsiao said, your Honor.

THE COURT: Okay. I want to keep going. "Counsel for Rhode Island Hospital have communicated several times that it intends to and would be producing responsive documents."

That's true; right?

MR. MAYERS: Yes, I believe so.

THE COURT: But it's not complete, is it?

MR. MAYERS: It is true, and also true that the last communication was on February -- yes, that's true.

THE COURT: That is not true actually. The last communication wasn't on February 4th. The last communication was on April 29th, the day before this was filed; correct?

MR. MAYERS: As to potential conferencing, I believe, but I believe as to when RIH was going to produce, I have no reason to doubt that that's accurate.

THE COURT: We have e-mails in the record where the Department of Justice says on the 28th we want to have a conference, and in response to that in the apology for being missing a few weeks is because somebody was on vacation, when it was really like three months, --

(Overlapping crosstalk)

MR. MAYERS:  And then the next date you send or somebody from the Department of Justice, and since you're all one unitary executive you're all the same, sends an e-mail saying hey, we need to have a conference on this.  Rhode Island Hospital responds on the 29th, and says okay does this time work or does that time work, and nobody responds from the Department of Justice; and you don't represent that to the Northern District of Texas.

Is that correct?  That's a yes or no answer.

MR. MAYERS:  Your Honor, if I could just briefly, February --

THE COURT:  No.

Yes or no:  She says here the last communication was, she says, let's see, the last communication was on February 4th.  Correct?

MR. MAYERS:  The last communication where RIH demonstrated that it intended to and would be producing responsive documents.

THE COURT:  I'm going to read the sentence to you.

MR. MAYERS:  Yes.

THE COURT:  "However, the last such communication" --

MR. MAYERS:  Yes.

THE COURT: -- "was on February 4th, and to date Rhode Island Hospital has produced only one document totaling six pages."

Now she's referring to "the last such communication," she says that "Counsel for Rhode Island Hospital communicated several times that it intends to and would be producing responsive documents."

MR. MAYERS: Yes.

THE COURT: Now, you don't see the conversation where they asked you, Are our search terms okay with you, and nobody responded? That's not a communication?

MR. MAYERS: I believe that is the communication reference.

THE COURT: Okay. And then from there you didn't, nobody from DOJ responded to them; correct?

MR. MAYERS: Yes, because of the paternity leave.

THE COURT: I'm sorry?

MR. MAYERS: It's because of the paternity leave of the --

THE COURT: Nobody said "paternity leave". They said "vacation" in the e-mail. So who was on paternity leave and when?

MR. MAYERS: I believe that was one of the trial attorneys on our team.

THE COURT:  In Texas?

MR. MAYERS:  In Washington, D.C.

THE COURT:  Why wasn't Texas handling it?

MR. MAYERS:  Because at this time this was the communication, the trial attorney assigned to communicating with Rhode Island Hospital.

THE COURT:  So there's a trial attorney who is communicating with Rhode Island Hospital.  Where is that person located?

MR. MAYERS:  That individual is in Washington, D.C.

THE COURT:  Okay.  Tell me who has been in touch with this case who is not in Washington, D.C.

MR. MAYERS:  Your Honor, I refer you to the, I believe the signature block in our petition to file, our petition for enforcement in Northern District of Texas.  I believe that includes...

THE COURT:  So I see Ryan Raybould, who is the United States Attorney.  Now you're not telling me he personally participated in this.

He's the Dallas and Fort Worth United States Attorney; correct?

MR. MAYERS:  That's correct.

THE COURT:  I'm assuming he's not in Fort Worth, but is in Dallas.

MR. MAYERS: In Dallas, yes, your Honor.

THE COURT: Okay. And then we have Brett Shumate. Where is he?

MR. MAYERS: He's in Washington, D.C.

THE COURT: Okay. And we have Jordan Campbell. Where is he?

MR. MAYERS: He's in Washington, D.C.

THE COURT: Okay. And Lisa Hsiao, where is she?

MR. MAYERS: She's in Washington, D.C., as well.

THE COURT: So nobody was actually in Fort Worth who signed off on this.

MR. MAYERS: Your Honor, Ethan Womble on the next page, --

THE COURT: Oh, I'm sorry, the next page.

MR. MAYERS: -- the U.S. Attorney in Fort Worth.

THE COURT: Okay. And he's in Texas; is that correct?

MR. MAYERS: Yes, your Honor.

THE COURT: And so he's in charge of this investigation in Texas.

MR. MAYERS: I wouldn't -- he's working in collaboration with the Enforcement & Litigation Branch team on this case.

THE COURT: Okay. So you don't think that was a misrepresentation to the Northern District of Texas to

say hey, we haven't heard anything from these people since February 4th.  You don't think Ms. Hsiao's statement in there is, at best, misleading?

MR. MAYERS:  No, your Honor, I believe that she's referring to communications in which Rhode Island Hospital expressed an intent to produce.

THE COURT:  And did you say -- well, you didn't see the let's meet next week and talk about the search terms as an expression of an intent to produce?

MR. MAYERS:  Not necessarily, your Honor.  I think that what she's referring to is the idea that Rhode Island Hospital says that a production was forthcoming.  In any case, your Honor, Rhode Island Hospital --

THE COURT:  When did they say a production was forthcoming?  After February 4th?

MR. MAYERS:  No, your Honor.  Those are the communications she's referencing.

THE COURT:  What I'm stuck with here is that, what I see is that in February Rhode Island Hospital sends search terms to the Department of Justice.  Somebody goes on paternity leave, we're not sure who, although they said I was on vacation for a couple of weeks.

The next communication is April 28th, which I'm

assuming you had already been in touch with Northern District of Texas and had already at least drafted this motion on April 28th.

MR. MAYERS:  Yes, your Honor, there are communications Northern District of Texas extended before that date, yes.

THE COURT:  When?

MR. MAYERS:  I can't pinpoint the exact date. It's when we first discussed this investigation Northern District Texas.  I believe it was mid-March, your Honor.

THE COURT:  So moving to compel was decided before April 28th; right?

MR. MAYERS:  No, your Honor, not the final decision, I don't believe.

THE COURT:  Okay.  So that as decided when?

MR. MAYERS:  I don't know the exact date for your Honor.

THE COURT:  Can you ask your co-counsel.

(Counsel confer)

THE COURT:  When was that drafted?  When was it written?

(Counsel confer)

MR. CAMPBELL:  Your Honor, I don't think either of us specifically recalls when it was drafted, but it

was drafted very near the date of filing.

THE COURT:  Was it before or after April 28th?

MR. CAMPBELL:  Likely after April 28th.

THE COURT:  Well, it was filed the 30th, so you think it was after the 28th, after that 5:00 or so p.m. communication from your agency to Rhode Island Hospital saying hey, let's have a meeting, sorry I was out for two weeks?

MR. CAMPBELL:  Excuse me, your Honor.  It was drafted during that week.

THE COURT:  Which day?

MR. CAMPBELL:  I don't specifically -- couldn't tell you the first day that it was picked up.

THE COURT:  Okay.  So you were in the process of drafting that when somebody from the Department of Justice sent an e-mail to Rhode Island Hospital saying hey, sorry, I've been out, I was on vacation for a couple of weeks, and let's talk about this this week or next week or whatever the issue was; right?  This was already being drafted?

MR. MAYERS:  It was being drafted that week.

THE COURT:  Okay.  And you don't see that as misleading the Texas judge who's relying on the ordinary sort of procedure of the Federal Government to provide relevant and full information to the court, as

we are, and we've been burned by it recently; and so in this case I think has he.

MR. MAYERS:  Your Honor, I would point out that Rhode Island Hospital in its motion for a stay did include the April e-mails that your Honor referenced, and the Northern District of Texas considered that submission and denied the motion to stay.

THE COURT:  They denied the motion to stay, but they didn't -- okay, fine, that's a motion to stay that has --.

All right.  Go ahead.

MR. MAYERS:  And I would note also, your Honor, that Rhode Island Hospital could have moved for reconsideration.

THE COURT:  Did you tell Rhode Island Hospital that you were going to file a motion to enforce in Texas?

MR. MAYERS:  No, your Honor.

THE COURT:  Why not?

MR. MAYERS:  I don't recall the exact discussion as to when we made that decision.

THE COURT:  But you didn't tell them you made a decision affirmatively not to let them know that you were moving to enforce it; correct?

MR. MAYERS:  I don't know if that was the

decision.  I believe the decision was just, you know, file the motion.

THE COURT:  You had communications with them two days before and you didn't say hey, we're in the process of filing a motion to enforce; right?

MR. MAYERS:  Your Honor, the subpoena was also live for 10 months and we got one document.

THE COURT:  Well, no, because you were negotiating with them.  That's the norm in a HIPAA subpoena.  You're going to tell me every subpoena that you've received has been complied with in the timeframe fully?

MR. MAYERS:  No, your Honor.  I will note, though, they mention negotiations as to I believe only a few of the requests.

THE COURT:  Did you suggest that you needed some other stuff?

MR. MAYERS:  Yes, your Honor, I believe so. Again, I wasn't on every phone call.

THE COURT:  Were you on any of the phone calls with the hospital?

MR. MAYERS:  No, your Honor.

THE COURT:  So when you say I wasn't on every phone call, you mean you weren't on any phone calls.

MR. MAYERS:  Yes; I don't recall a phone call I

was on with them.  I'd joined the Department relatively recently so I believe I --

THE COURT:  When did you join the Department?

MR. MAYERS:  Late November.

THE COURT:  And from where?

MR. MAYERS:  I was clerking.

THE COURT:  For whom?

MR. MAYERS:  A judge in the Middle District of Florida.

THE COURT:  And before that you were in law school?

MR. MAYERS:  I was clerking.

THE COURT:  For how many years?

MR. MAYERS:  So I clerked for three years for three great jurists in Florida; first Florida Supreme Court for Justice John Couriel, and then for Judge Barbara Lagoa in the Eleventh Circuit, and then Judge Kathryn Kimball Mizelle in the Middle District of Florida.

THE COURT:  Okay.  And then you came to the Department of Justice in November?

MR. MAYERS:  Your Honor, I had a brief stint in private practice.  Sorry, that was during the shutdown and they moved, so I had a brief stint in private practice, and then I joined the Department.

THE COURT:  Brief, like weeks?

MR. MAYERS:  It was a month.

THE COURT:  Okay.  Thank you.

MR. MAYERS:  Yes.

Turning briefly to the collateral attack doctrine we submit that applies here.

THE COURT:  So I feel like I'm -- this isn't really fair to you because I feel like they're putting somebody brand now out here to argue this, and I think that's intentional.  But tell me what does the collateral attack doctrine require you to show.

MR. MAYERS:  So the *Celotex Corp. v. Edwards* --

THE COURT:  I'm sorry, say that again.

MR. MAYERS:  So the *Celotex* case we cite, you know, we also cite *Pratt v. Buntis*.

THE COURT:  Where are the cases?

MR. MAYERS:  The Sixth Circuit.

THE COURT:  We're the First Circuit here, so talk to me about First Circuit case law.

MR. MAYERS:  Yes.  Your Honor, I believe we set a few of those in our motions as well, but essentially the essence is that the doctrine forbids a party from seeking to circumvent an earlier ruling of one court by filing a subsequent action in another court.

THE COURT:  Okay.  But what about your own party

preclusion, because neither party was before the Texas court.  Let's start with the Child Advocate.

MR. MAYERS:  Uh'huh.  Yes, your Honor.  So I believe the Sixth Circuit case the Child Advocate cites discusses, you know, reference to *res judicata*.  It would be our submission that the patients in the hospital were in privity and therefore the judgment against the hospital would also reach the patients.  The hospital raises the patients' interest and so we would argue that that is what applies with respect to the Advocate.

THE COURT:  Okay.  Let's talk about them then.  Did you give notice to Rhode Island Hospital?

MR. MAYERS:  Your Honor, we served Rhode Island Hospital I believe on Saturday -- maybe actually the Monday following.  So we received the order, and there were some questions earlier about when the Department received, you know, the Northern District of Texas order.  We did so on Friday, and we served that on Rhode Island Hospital on the following Monday.

THE COURT:  After the order was issued.

MR. MAYERS:  Yes, your Honor, we were -- as your Honor noted the issue was --

THE COURT:  Okay.  Did you provide the Texas court with any facts supporting the court's

App. 91

jurisdiction before it granted your petition to enforce?

MR. MAYERS:  I believe the supplemental Hsiao Declaration came after.

THE COURT:  So, no.

MR. MAYERS:  Yes, your Honor, I believe we included the relevant subsection in our petition to enforce.

THE COURT:  I'm talking about jurisdiction --

MR. MAYERS:  Yes.

THE COURT:  -- for the Northern District, not jurisdiction over the statute.

So did you provide before the judge signed off on your order any information to that judge that supported jurisdiction in the Northern District of Texas?

MR. MAYERS:  Your Honor, personal jurisdiction, subject matter, both?

THE COURT:  Jurisdiction of that court to issue an order so, yes, jurisdiction.

MR. MAYERS:  Yes, your Honor.  So we cited subsection (c) which we think (indecipherable) Texas with jurisdiction.  We did not submit the Hsiao --

THE COURT:  You said section (c), so you also need to tell the court I'm investigating this entity or

that entity that is in Texas or Texas is the center of the investigation; right?

MR. MAYERS:  Yes, those facts which we ultimately did provide in which --

THE COURT:  After the order.

MR. MAYERS:  Correct, your Honor.

THE COURT:  Okay.  That's what I'm trying to get it.  So you didn't provide them beforehand; correct?

MR. MAYERS:  Your Honor, the relevant facts were in existence before the order was entered.

THE COURT:  It's not a matter of whether the facts were in existence.  The judge needs to know the facts to make a decision.  Just like I can't ask you questions about meetings you weren't at with Rhode Island Hospital.

MR. MAYERS:  Your Honor, the Northern District of Texas, the court there concluded that it had enough in front of it to issue the order.

THE COURT:  But has to make an independent determination to determine the collateral attack doctrine and whether it applies; and you've asked me to rule that this is a collateral attack.  And with respect to Child Advocate, I don't think you have standing for that.

But with respect to Rhode Island Hospital, I'm

trying to ascertain if the Department of Justice misled the judge in Texas, which it seems clear it did, about certain facts.  And we haven't even gotten into the specifics of other things that I think are misleading.

MR. MAYERS:  Your Honor, I disagree that we misled the judge.

THE COURT:  Okay.

MR. MAYERS:  And I would submit that, again, I don't -- the Rhode Island Hospital specifically did not put forth the case that says the, you know, facts that existed prior to court's order but that, you know, were submitted to the court after somehow negates a finding of proper venue or jurisdiction.

THE COURT:  But he has to make that finding, and he's basing it on what he has in front of him.

MR. MAYERS:  Yes, your Honor, he did, and we would submit it was a correct finding.

THE COURT:  Based on the facts only known to you.

(Indecipherable crosstalk)

MR. MAYERS:  -- that we provided to your Honor under seal.

THE COURT:  Afterwards.

MR. MAYERS:  Correct, but those facts existed beforehand so --

THE COURT:  But did they?

MR. MAYERS:  Yes, your Honor.

THE COURT:  Okay.  That better be true.

Okay.  Go ahead.

MR. MAYERS:  Thank you.  And so to touch on one of the responses to the collateral attack doctrine's due process --

THE COURT:  Uh'huh.

MR. MAYERS:  -- your Honor discussed that with Rhode Island Hospital.  As we point first to the fact that service of summons under 3486(e) established personal jurisdiction over Rhode Island Hospital, and also we would direct your Honor to the case law in the Section 1782 context where petitions are often granted *ex parte* and respondents show up after and move for reconsideration, and certain courts have concluded that that process, that allowing the respondent to move for reconsideration satisfies.

THE COURT:  Can you give me a case --

MR. MAYERS:  Yes, your Honor.

THE COURT:  -- in this circuit or Supreme Court.

MR. MAYERS:  The one case I have in front of me, your Honor, is Second Circuit, but I'd be happy to --

THE COURT:  Second Circuit is not our circuit.

MR. MAYERS:  Yes, understood.  But I would note,

App. 95

your Honor, that I looked through those cases.  I believe there's First Circuit case, I'd be happy to provide it after, don't hold me to it necessarily, but the cases I read have uniformly concludes that that process satisfies due process.

I would note also that given the window of time with which Rhode Island Hospital was given to comply, there was enough time for them to move for reconsideration or move to relief as they have.  So the enforcement has not occurred yet, and so the deprivation has not occurred yet, and there's time, as Rhode Island Hospital has illustrated, by litigating in two -- three courts.

THE COURT:  What three courts?

MR. MAYERS:  The Northern District of Texas, the Fifth Circuit, and in front your Honor.

THE COURT:  Did the Fifth Circuit make a decision while we've been here?

MR. MAYERS:  My phone has been off, so I don't know.

THE COURT:  Okay.

MR. MAYERS:  So your Honor, that's the collateral attack doctrine.  We submit that it applies at least with respect to Rhode Island Hospital.

THE COURT:  If they weren't present in Texas,

I'm not sure how you apply it.  First of all, nonparty preclusion with respect to the Child Advocate, you don't have it; right?  I mean you can agree they weren't a party there.

MR. MAYERS:  They were not a party, we argue they were privity, they are a party to that action, we would submit.  Of course they could have moved for reconsideration as well.

THE COURT:  Why should they have to go to the Texas because the Government chose Texas.  She is the Child Advocate for the State of Rhode Island and the children in DCYF care, some of our most vulnerable children; and we're going to get to how you propose that we separate them out later.

But why on earth, when she was not a party there, you didn't make her a party there.  I'm assuming that Rhode Island Hospital must have known that some kids must have in State care at some point in the five, six years that you've asked for records for.  It's a little more than six years.

So I mean I think, you know, there's no reason to require her to go to Texas to litigate a subpoena in Rhode Island for the information from a Rhode Island hospital that you sought from D.C., that you move to Texas for what I think we can all agree you sought a

favorable forum or what you believe to be a favorable forum, and so there's absolutely no reason for this Court to make a finding that they're precluded by the collateral attack doctrine.

Talk to me about Rhode Island Hospital.

MR. MAYERS:  Yes, your Honor.  So we would argue, again, that they were a party and that, you know, essentially what they're seeking to do here is to undue an order that was entered against them.  Their response as to why the collateral attack doctrine (indecipherable) apply is due process, and that's why I walked through with your Honor the holdings of one case, I cited others, that find an opportunity for reconsideration and the 1782 context satisfies due process.  So we argue here that they had that opportunity.  They forewent it.

THE COURT:  Well, they didn't have an opportunity.  How can you possibly say they had an opportunity to appear in Texas when you sought the order -- what time did you file that order in Texas?

MR. MAYERS:  I believe it was early afternoon, your Honor.

THE COURT:  Give me an proximate.

MR. MAYERS:  I'll probably say 2:00 or 3:00 p.m., although I don't, you know...

THE COURT: What time did you get the order?

MR. MAYERS: Got the order the next day.

THE COURT: The order was issued that day. So when did the order issue?

MR. MAYERS: Your Honor, Judge O'Connor signed the order on April 30th. However, we received the order?

THE COURT: I'm not interested in when you received it. When was it effective?

MR. MAYERS: I believe when he signed the orders that would be April 30th.

THE COURT: What time?

MR. MAYERS: I'm not aware of the exact time he signed it. However, I will note as this past Sunday indicates Judge O'Connor does issue orders late at night so, you know, we can't exactly approximate when he signed it on the 30th, so I don't have any more specific information --

THE COURT: Understood.

MR. MAYERS: -- as to time.

THE COURT: And he issued the order without Rhode Island Hospital being notified that the motion had been filed; correct?

MR. MAYERS: I believe, and I can double-check on this; I believe we notified Rhode Island Hospital of

the motion and then once we got the order we did that as well.

THE COURT: 6:12 p.m. Rhode Island time; correct?

MR. MAYERS: I'll take your word for it, your Honor.

THE COURT: And so you notified them that you had already filed this when you said never mind, we don't need a conference that we just asked for two days ago; correct.

MR. MAYERS: I believe that's what the e-mail said, yes.

THE COURT: Okay. Go on.

MR. MAYERS: Again, your Honor, my point is that the due process argument we don't think is a successful one or a meritful one or one that has merit because of the 1782 cases. So those say, you know, if you can move for reconsideration, you can show up and contest production before production is required, that that satisfies due process.

THE COURT: Well, why not tell Rhode Island Hospital? Don't you think that looking at it from Rhode Island, where you're subpoenaing Rhode Island Hospital records from Rhode Island children, who are protected by the Rhode Island Child Advocate, and you

go to Northern District of Texas and arguably center your investigation there, which I don't buy; but at some point you decide to center it there and you go to the court there and you ask for the order.  Why not tell Rhode Island Hospital?  Did you not want them to have an opportunity to object?

MR. MAYERS:  Your Honor, we are happy to litigate this out as our, you know, papers show we --

THE COURT:  Well, you didn't want to litigate it here; right?

MR. MAYERS:  Well, we want to litigate where the investigation was carried out?

THE COURT:  Is that true?  Didn't you litigate others in other places, and you're 0 for 7 in those other places?

MR. MAYERS:  Those are all motions to quash, --

THE COURT:  Right.

MR. MAYERS:  -- correct, so --

THE COURT:  You didn't move them to the Northern District of Texas, did you?

MR. MAYERS:  No, because the statute allows the subpoena recipient to move to quash in a district in which they reside,

THE COURT:  Okay.

MR. MAYERS:  -- so --

THE COURT:  Did you move to compel NYU to provide it in the Northern District of Texas?

MR. MAYERS:  No, your Honor, we did not.

THE COURT:  Go ahead.  So the reason not to, just so we're clear, the process works if everybody is transparent with each other and if we're up front and we don't file things under oath that are misleading at best and we don't mislead opposing counsel.  So in a position now, I would tell anybody you have to file a motion to quash if you're dealing with the Government every single time and every single time I will require the Government to file something, because you can't rely on the Government to do what they've done over the last 50 years to deal with these, 30 years that HIPAA has been in place.  So understand that I take a very negative view to playing fast and loose by telling people one thing and filing other things with the court, and then taking the position like, oh, well, we didn't tell you, but we did tell you afterwards.  That is dirty pool, in my opinion, and the Department of Justice have willfully done that in this case.  And we haven't gotten to the things that I think you've misrepresented in your filings in Texas; well, some of them we have.  Go ahead.

MR. MAYERS:  Your Honor, I would note also that

we would expect, as Rhode Island said, that they would comply with the subpoena.

THE COURT:  And they did, and they sent you search terms, and nobody responded.  Why not?

MR. MAYERS:  They had provided us with one document in 10 months and now --

THE COURT:  How many documents do you need?

MR. MAYERS:  If there's only one document responsive to the subpoena, again, your Honor noted I'm new to this practice, but I'd be surprised.

THE COURT:  Well, but we don't know, do we, because you never had that conversation with Rhode Island Hospital; correct?

MR. MAYERS:  Your Honor, Rhode Island Hospital never told us that the one document they provided was the entirety of the responsive documents.

THE COURT:  Right; because they were working with you on search terms for things like advertising, billing, that kind of stuff; right?

MR. MAYERS:  Your Honor, the idea that Rhode Island Hospital would have complied with the subpoena that they now argue is entirely --

THE COURT:  Oh, I think it's pretty clear that they would have.  They may have negotiated like you did in Los Angeles, and we're going to talk about that

because you didn't tell the Texas court about the anonymized data that you agreed to there, or other places.  So that's another falsehood or arguably leading filing in Texas.

MR. MAYERS:  I disagree, your Honor, but --

THE COURT:  Based on what?

MR. MAYERS:  Your Honor pointed to a provision of the Hsiao Declaration that says the patient records, generally the patient records, --

THE COURT:  Uh'huh.

MR. MAYERS:  -- are important or essential to the investigation.

THE COURT:  So you're saying that anonymized data is fine; you don't need the actual identifiable data.  Is that what you're saying?

MR. MAYERS:  Your Honor, it has been our practice to the extent that I'm aware of offering anonymized data request or an anonymized data production to recipients.

THE COURT:  When did you offer that to Rhode Island Hospital?

MR. MAYERS:  I was informed that we -- to the best of my recollection I was informed that we had, but I can't confirm that or confirm the date of that.

THE COURT:  Can you confirm who would have made

that offer?

MR. MAYERS:  Who would have made that offer would be a member of I believe either the Enforcement and Affirmative Litigation Branch or a member of our team in Northern District of Texas.

THE COURT:  Okay.

MR. MAYERS:  I believe the offer in this case, if one was made, and I can't confirm that without double-checking would be --

THE COURT:  Can you double-check with co-counsel?  I think he's running this case generally; right?

(Counsel confer)

MR. MAYERS:  Your Honor, it would have been David Gunn, --

THE COURT:  When?

MR. MAYERS:  -- who was the trial attorney in the case.  He's in Washington, D.C.

And to be clear, if Rhode Island Hospital were to come to us and say would you be willing to go and asked the court for, you know, anonymized records, that would be fine with us.

THE COURT:  But you -- oh, so you'll do that now?

MR. MAYERS:  Yes, your Honor, we would still

take -- if they agree to produce anonymized records, patient records, we would take those.

THE COURT:  And that wouldn't be a violation of the Texas judge's order?

MR. MAYERS:  We would go to Judge O'Connor and say the parties have discussed in the light of your Honor's order and we would take anonymized.

THE COURT:  But when I asked you before if you could agree to an extension of that judge's order you said no because it was court order; didn't you?

MR. MAYERS:  Your Honor, I believe we said that we could not guarantee how Judge O'Connor would rule on such order and that we were not in a place to request such an order at this time.

THE COURT:  But then you can't make that representation to Rhode Island Hospital of whether anonymized data would work.

MR. MAYERS:  We could make the representation that we would agree to go to the court and say that we have discussed and that pursuant to our approach in the other investigations we would accept anonymized patient data.

THE COURT:  I'm going to ask counsel for Rhode Island Hospital to address when and if that was stated, and I'm going to ask for an affidavit from Mr. Gunn by

App. 106

the beginning of tomorrow, under oath, telling when it was offered to Rhode Island Hospital, by whom it was offered, to whom it was offered, and in what capacity, and I'd like that filed by tomorrow morning at 9:00. Go ahead.

MR. MAYERS:  Okay, your Honor.  And just to be clear, that is my recollection.  I cannot speak for Mr. Gunn.

THE COURT:  And you actually told Texas actually in addition to that, and I don't mean to interrupt, but in your filing in the Northern District of Texas you cite to Ms. Hsiao's affidavit and you also say that they -- you didn't say we've asked for anonymized data and they refused, they didn't agree to provide it. Correct?

MR. MAYERS:  It is not in the affidavit, your Honor.  Again, I could be wrong in remembering that and so I don't want to tie Mr. Gunn to my statements here. It is, you know, this is an investigation involving many parties and many conversations, so I can't commit Mr. Gunn to that statement.

THE COURT:  But you did.  You said he said it.

MR. MAYERS:  Your Honor, I said that to the best of my recollection --

THE COURT:  The Department of Justice cannot say

we're going to send somebody who's brand new and has no contact with this case other than being the new guy in Washington -- and it's not fair to you and I recognize that this is going to make you never want to go to court again, and I can tell you I had similar experiences in my practice.  But --

MR. MAYERS:  Your Honor, I don't mind, I'm happy to be --

(Indecipherable crosstalk)

THE COURT:  -- go to court again.

MR. MAYERS:  I'm happy to be back --

(Indecipherable crosstalk)

THE COURT:  But is unfair for the Department of Justice to sit there and say we don't know, we don't know, we don't know, because we're sending somebody who has had no contact with the case.

MR. MAYERS:  Your Honor, I'd be happy to ask Mr. Gunn.  That is what I can commit to.  I can't commit to him saying something.

THE COURT:  Well, if it's not true, then I want that too, if nobody made that representation.

MR. MAYERS:  We can provide a statement as to the extent of our communications with RIH on patient records, your Honor.

THE COURT:  Great.

What are you investigating in the Northern District of Texas?

MR. MAYERS:  Your Honor, so, again, there are multiple as I (indecipherable) static or not a stagnant investigation.  There are multiple prongs to it.  This specific subpoena related to the FDCA --

THE COURT:  Okay.

MR. MAYERS:  -- and to our --

THE COURT:  Tell me what specifically is the FDCA.

MR. MAYERS:  So your Honor, the main theory we've espoused, and I'll push back a little bit on the idea that our theories have been shifting.  If you look back at, for example, our first filing in the District of Massachusetts, we say there are two or at least two potential things we're investigating.  First is off-label promotion and misbranding by pharmaceutical companies.

THE COURT:  Okay.  But Rhode Island Hospital can't be liable for that; correct?

MR. MAYERS:  Your Honor --

THE COURT:  There could be a witness potentially or a holder of information, but not themselves liable for misbranding.

MR. MAYERS:  So Rhode Island Hospital can be a

witness, and we think Rhode Island Hospital can also be liable under a conspiracy theory.  The Government has charged that in the past.

THE COURT:  In these kinds of cases.

MR. MAYERS:  Yes, your Honor.  So the theory works in that pharmaceutical company provides financial incentives to doctors to prescribe off-label and therefore that has been viewed as a conspiracy.

THE COURT:  Can you give me the cites of where you've charged that.

MR. MAYERS:  There is a case I believe in the Eastern District of New York called *Gleason*.

THE COURT:  I'm sorry?

MR. MAYERS:  *United States vs. Gleason*.  I'll be happy to get --

THE COURT:  Do you know approximately when that case was?

MR. MAYERS:  I believe that case was probably early 2010s.

THE COURT:  And any others?

MR. MAYERS:  That is the one I know of off the top of my head, your Honor.

THE COURT:  And who was charged in the *Gleason* case?  The hospital?

MR. MAYERS:  So Mr. Gleason was a doctor.  And

there was also the case, the *Caronia* case that my friends on the other side cite as First Amendment context.  I believe *Caronia* was a pharmaceutical company employee that was indicted in this similar, you know, scheme or in this same scheme, excuse me.

THE COURT:  Uh'huh.

MR. MAYERS:  So the idea would be that the pharmaceutical company is providing incentives through off-label protection and through certain incentives to doctors, and those doctors turn around and be remunerated for the amount of prescribing they would do and so that you --

THE COURT:  Do you have any evidence to support that theory?

MR. MAYERS:  Yes, your Honor, not in -- I'd double-check with respect to specific RIH employees. We do have evidence that this has happened.

THE COURT:  Where?

MR. MAYERS:  In this specific context, I believe the case I'm thinking about is in California.

THE COURT:  In Los Angeles?  Is that the Los Angeles County one where you agreed to the anonymized data?

MR. MAYERS:  I believe that the individual I'm thinking is, the set of facts I'm thinking of does

relate to CHLA.

THE COURT:  Okay.  Go ahead.

MR. MAYERS:  So your Honor, that is the idea. It's not, you know, off-label prescribing.  We're not -- we've never argued that it's an FDCA violation. Instead it is both RIH as a witness and then this conspiracy idea and then --

THE COURT:  But that's a criminal investigation, the conspiracy idea.

MR. MAYERS:  Yes, your Honor.

THE COURT:  Okay.  And what specific conspiracy are you investigating?  Because there are different kinds of conspiracy.

MR. MAYERS:  So it would be a conspiracy to, well, so in this instance, right, so again as I said there are multiple prongs to investigation; right?  So there are other potential theories that aren't spoken to in this case with the subpoena, you know, there's ideas of false billing which we think is relevant to the extent it speaks to --

THE COURT:  But that's a healthcare violation; right?  That's not a FDCPA or whatever you call it violation; correct?

MR. MAYERS:  Your Honor, it is, it can be evidence in an FDCA case of fraudulent intent, but we

agree that false billing alone is not --

THE COURT:  And if Rhode Island law -- and states administer Medicaid; correct?

MR. MAYERS:  Yes, your Honor.

THE COURT:  Okay.  And so if Rhode Island allows for off-label use and billing of Medicaid for off-label use of drugs, then how do you get to a criminal conspiracy?  Criminal is a little bit of a higher standard, you may have heard, than civil case, so --

MR. MAYERS:  I know of criminal and civil in my clerkship.

THE COURT:  Okay, there you go then.  So you know it's beyond a reasonable doubt and there needs to be probable cause to charge.

MR. MAYERS:  To charge, yes.

THE COURT:  And not a fishing expedition.

MR. MAYERS:  And not to issue a subpoena.

THE COURT:  Well, subpoenas are not supposed to be fishing expeditions, are they?

MR. MAYERS:  We would contend that ours is not, your Honor.

THE COURT:  Okay.  So you have direct information that supports a subpoena to Rhode Island Hospital for each of the 15 things you've requested.

MR. MAYERS:  Your Honor, we have the Hsiao

Declaration speaks to generally the relevance in each request.

THE COURT:  Uh'huh.

MR. MAYERS:  The Hsiao Declaration also identifies certain instances what we think is billing fraud by Rhode Island Hospital, kids with central precocious pubic billing over the age of --

THE COURT:  Wait.  Say that again.

MR. MAYERS:  Yes, let me just pull up this.

THE COURT:  Yes.  Tell me where you're referring to this.

MR. MAYERS:  Your Honor, I refer to you paragraph 36 for Hsiao Declaration.

THE COURT:  Hang on, I'm looking.

MR. MAYERS:  Page 15 --

THE COURT:  Okay.

MR. MAYERS:  -- on the footer number.

THE COURT:  Okay.

MR. MAYERS:  So there it says, quoting now, "For example, based on diagnosis codes it appears between 2020 and 2025 there were at least four minors first diagnosed at RIH with central precocious --

(Court Reporter requests clarification)

MR. MAYERS:  "For example, based on diagnosis codes it appears that between 2020 and 2025 there were

at least four minors first diagnosed at RIH with central precocious puberty at age 12 or older."

THE COURT:  Okay.  So I don't know where you have that information from but, you know, you're not a doctor; right?

MR. MAYERS:  I'm not.

THE COURT:  Okay.  And I'm assuming you're too young to have children who've gone through puberty.

MR. MAYERS:  That is a correct assumption.

THE COURT:  But as somebody who has premature babies in their family, their precocious puberty can be diagnosed for a preemie later because of growth retardation; isn't that correct?

MR. MAYERS:  Again, I'm not a doctor, so I --

THE COURT:  Neither am I, but I'm facing this on very old knowledge because my kids are older.

MR. MAYERS:  Yes.  So as to what I can say as to central precocious puberty itself is what is in the follow-on sentence, right, where it says, "Precocious puberty is usually defined as the onset of puberty before age eight in girls and before age nine boys."

THE COURT:  Usually.

MR. MAYERS:  So -- yes.  So I would agree with your Honor that perhaps there are completely lawful reasons why each of these individuals was diagnosed

with central precocious puberty at age 12 or older; however, I would submit we can investigate whether there are legitimate reasons or not.

THE COURT:  Well, what would be the violation? Let's say a doctor does diagnose somebody who is 12 or older with precocious puberty and it is for the purpose of gender-affirming care.  Why is that something that the Federal Government, as distinguished from the State of Rhode Island -- and I again refer you to the *Scrmetti* decision.  Why does the Federal Government get to decide that and not Rhode Island?

MR. MAYERS:  So the Federal -- (A) *Skrmetti* said the Fourteenth Amendment does not prohibit states from deciding to, you know, preclude this.

THE COURT:  Or allow, or allow.  The corollary is "or allow."  I know you want to focus on "preclude," but *Scrmetti* said it was the State's decision.

MR. MAYERS:  I will agree, I will agree it's for "allow" as well.  I agree the corollary is, can follow on *Scrmetti*.

THE COURT:  A hundred percent.

MR. MAYERS:  I will say that *Skrmetti* does not say, And the federal government can investigate potential violations of federal law in the case --

THE COURT:  What is the federal law?  That's

what you haven't answered.

MR. MAYERS:  Your Honor, happily.  So for example, (1) false statements in a healthcare case, so 18 USC 1035.

THE COURT:  False statements...

MR. MAYERS:  In a healthcare case.  So 18 USC, so I can speak both to, I'll speak to --

THE COURT:  But that's healthcare fraud; right?

MR. MAYERS:  Your Honor, I will speak both to the FDCA and others.  So I took your question to be asking generally what could be.  So in the FDCA space, we agree that the FDCA on its own does not speak or does not criminalize the act of false billing in and of itself; however, we believe that false billing can be evidence of an intent to mislead or fraud.  I think that's a, you know, pretty basic statement.  I don't think anyone disagrees with that.  You know, a fraudulent statement in a billing record could speak to that intent.

THE COURT:  Who is the fraudulent statement to?

MR. MAYERS:  To the healthcare -- to the insurance company; excuse me.

THE COURT:  I see.  So in the case of the Child Advocate, I would assume it's most Medicare or Medicaid.

App. 117

MR. MAYERS:  Yes.  And your Honor, you raise a point, well, you know, it's covered in Rhode Island so why would they do this?  Exactly.  We don't know.

THE COURT:  So unlikely; right?

MR. MAYERS:  All we can speak to is what we've seen.

THE COURT:  So, but you understand, like take a step back.  I understand you have your position you're an advocate, and I give you credit for it especially because I think they threw you up here.

MR. MAYERS:  I'm happy to be here, your Honor, there's no throwing --

(Indecipherable crosstalk)

THE COURT:  I'm sure you are, and I'm sure you're required to say that, but --

MR. MAYERS:  I'm not, I'm not paid to say --

THE COURT:  I have law clerks; I know what they say.

But here's the thing.  So Rhode Island gets to decide, you have four, arguably four cases you said where, for example, and this is under oath based on diagnostic codes it appears that between 2020 and 2025, so for five years.  There were at least four minors first diagnosed at Rhode Island Hospital -- I don't know how you know this, but I assume it's from records

from other hospitals like in Texas -- with central precocious puberty at age 12 or older.

Okay.  How many patients were treated at Rhode Island Hospital with gender -- with puberty blockers during that time?

MR. MAYERS:  Your Honor, before I answer, also we rely on paragraphs 37 and 38 which speak to a spike in the number of claims with an "unspecified endocrine disorder," and so it would be odd around the time that the number of claims for gender dysphoria increase that there's the similar spike in endocrine disorder.

THE COURT:  Could it not also be with respect to their being either a limitation of gender-affirming care facilities and a centralized sort of Rhode Island Hospital and Brown Health being the sort of centralized medical provider in Rhode Island?  Couldn't it also be that smaller agencies that provided that care were folded into Rhode Island Hospital?

MR. MAYERS:  That could speak to a rise in gender dysphoria claims.

THE COURT:  And gender-affirming care.

MR. MAYERS:  No, but the number of claims for "unspecified endocrine disorder" also increased.

THE COURT:  But if Memorial, Pawtucket Memorial Hospital closes and those patients who were being

treated for endocrine -- and by the way it did and I think it was in this time frame -- and so the patients being treated for endocrine disorder have to go somewhere else; right?

MR. MAYERS:  Yes.

THE COURT:  And the most likely place would be Rhode Island Hospital, which also encompasses Miriam Health, I believe.  Brown Health is all of those things.  So there could be a very innocent reason for that.

MR. MAYERS:  There could be, but again --

THE COURT:  So why do you need highly-sensitive, personalized, individually-identifying information about the most vulnerable children in order to follow up on a hunch based on things where you don't seem to have a real Rhode Island understanding of what's happened in our healthcare in the last five years, six years.

MR. MAYERS:  Your Honor, there could be a completely innocuous explanation, but *Morton Salt*, for example, says we can investigate to determine whether there is or not.  There is a point in an investigation --

THE COURT:  Right.  Investigate away.

Why do you need individual personalized

information about individual children?

MR. MAYERS:  Because, again, how would we tell, for example, whether this child with central precocious puberty diagnosis, how would we tell whether that was a legitimate one, maybe they were born prematurely, or how would we tell it's false billing.  We would have to look at the patient records.

THE COURT:  And you think the Government has the right to look at everybody's patients' records to see if those four cases, and you can't tell me how many people were treated with puberty blockers during that time.

MR. MAYERS:  I don't believe it's an exponentially higher number.  I can --

THE COURT:  Well, it's more than four; right.

MR. MAYERS:  Yes, I would agree it's more than four.

THE COURT:  Okay.  Go ahead.

MR. MAYERS:  But again, your Honor, we would not be able to tell whether a potential explanation that you offered or kids coming in with unspecified endocrine disorders is right or whether, again, a doctor to, you know, insurance coverage or to hide up or to, you know, to hide some off-label promotion scheme.

THE COURT:  Off-label is not illegal.

MR. MAYERS:  Again, we agree off-label prescription is not illegal in and of itself.  Our position though is that --

THE COURT:  I'm sure you don't know my background.  I spent 25 years as a criminal defense attorney, including in the Federal Defender's Office; and it seems that the Government is having a really hard time articulating what it is they're investigating.

So I'm going to ask you again specifically what are you investigating?  And bear in mind what Lisa Hsiao represented to the Northern District of Texas.

MR. MAYERS:  Right.  So Lisa Hsiao's Declaration speaks to our FDCA investigation.  It speaks to the relevance of each request.  And your Honor, I'll back up first and say First Circuit, I know you want First Circuit cases, so I will, so *Sturm Ruger* and *Ricco Jonas*, all these cases say a stay summary proceeding and we don't need to hash out, you know, the exact specifics of an agency's authority to reg --

THE COURT:  Oh, I complete agree; but I have to make a finding that you had a legitimate law enforcement purpose and that you didn't mislead the judge in Texas; correct?

MR. MAYERS:  To make what finding, your Honor?

THE COURT:  For him to order the issuance of the, the compliance with the subpoena; correct?

MR. MAYERS:  I'm not sure about that.  I would think you would have to conclude in this proceeding --

THE COURT:  Uh'huh.

MR. MAYERS:  -- that the effects of this order is void, which we don't think it is.

THE COURT:  Or that there can be a collateral attack based on the fact that these parties were not in Texas and we're not in Texas.

MR. MAYERS:  Yes, your Honor would have to find a route to conclude that the Northern District of Texas' order on the same subpoena can be set aside in this court.

THE COURT:  I don't need to set it aside; I can just quash the subpoena and then there's nothing for the Texas court to enforce.

MR. MAYERS:  Well, your Honor, that's a (indecipherable).

THE COURT:  But I don't need to decide that the Texas judge did something wrong; I can just quash --. See, the problem I'm having here is that it's pretty clear to me that this was shopped to Texas, that's fine, you have the right to investigate wherever you

App. 123

want, but these indictments that come out of Texas, if they ever come, because every person has signed an affidavit in this court and is going to be before me to explain it if they don't.  That's one.

MR. MAYERS:  Your Honor, --

THE COURT:  Two -- no.

MR. MAYERS:  Your Honor, I don't believe the investigation is out there, grand jury investigations are, you know --

(Indecipherable crosstalk)

THE COURT:  It's in Texas, the grand jury is in Texas.

MR. MAYERS:  Yes, your Honor.  But I'm saying any investigation can be transferred, right --

THE COURT:  Right, so we'll just check to see if you transferred it, but it better come out of Texas. What I'm saying is if this was done and you lied to this Court or misrepresented the facts to this Court and convened that grand jury after this was filed, there will be issues with false representations to this Court; and we're at the end of our tether with the DOJ making false representations in this District.  So I'm going to say that, and that is just a warning.

But if I, I make a finding that you did not, that you violated the due process of Rhode Island

Hospital and certainly the -- I think the Child Advocate is pretty clear, it's not a precluded collateral attack; correct?

MR. MAYERS:  We think the analysis is cleaner understanding in our opinion with respect to the Child Advocate.

THE COURT:  Okay.  And you say nobody has standing to move to quash the subpoena?

MR. MAYERS:  We would argue that in order to, again, set aside functionally this --

THE COURT:  I'm not setting aside.  We're dealing with something they were not a party to, so talk about what they're asking.

MR. MAYERS:  Yes, your Honor.  Again, I think it's well established that district courts cannot set aside or interfere, et cetera, with another district court's order, and I think that is what will be required here to provide the Child Advocate or Rhode Island Hospital with redress.

THE COURT:  Why?

MR. MAYERS:  Because the order still stands regardless, the order compelling Rhode Island, ordering Rhode Island Hospital to comply would stand regardless.

THE COURT:  But did you provide the relevant information to the judge in Texas?

MR. MAYERS:  Yes.  And he concluded after -- assuming your Honor thinks the April e-mails --

THE COURT:  I'm sorry?

MR. MAYERS:  Assuming your Honor thinks the April e-mails between the Department and Rhode Island Hospital are relevant to the district judge's determination, he reviewed those e-mails.  Rhode Island Hospital provided them --- -

THE COURT:  But didn't he also --

MR. MAYERS:  -- and reached the same conclusion.

THE COURT:  But they provided them after the fact and they weren't -- he didn't assert jurisdiction with a jurisdictional nexus during the time; you just said it and he signed off and, in fact, I think he signed the order that you produced.

But the health benefit program that's in Ms. Hsiao's affidavit, you didn't tell him certain relevant facts, right, that you had negotiated with Rhode Island Hospital over the period of 10 months, that you had been in touch with them two days.

Any of that provided to that judge?

MR. MAYERS:  Your Honor, not with our petition -- what Ms. Hsiao's Declaration said, of course, was provided; however, I don't read in 3486 any of those facts being necessary, you know, a necessary

prerequisite.

THE COURT:  So you're saying you have kind of mislead the court to get what you want under 3586.

MR. MAYERS:  I'm not saying that, your Honor.

THE COURT:  Okay.  Go ahead.

MR. MAYERS:  We've discussed it briefly, but to go to the factors the First Circuit has set out for the enforcement of a subpoena, there are four of them. Subpoenas issued for a congressionally-authorized purpose.

THE COURT:  I'm sorry, say that again.

MR. MAYERS:  The subpoena is issued for a congressionally-authorized purpose.  I'm quoting from *Sturm Ruger & Co.*, First Circuit 84 F.3d, this is at page 4.

THE COURT:  Go ahead.

MR. MAYERS:  So this is *Sturm*, and there's other cases that speak to the same standard, right, "the subpoena is issued for a congressionally-authorized purpose."

We think here, we know here that 3486(a) authorizes the Attorney General to issue subpoenas to investigate violations of federal healthcare offenses. (2) the information sought is relevant to the authorized purpose.  We think Ms. Hsiao's Declaration

App. 127

speaks to the relevancy of the request.  And also I've outlined to your Honor two theories, one being that Rhode Island Hospital possesses, could possess evidence relevant to potential misconduct by pharmaceutical companies and (2) Rhode Island Hospital could have engaged in a conspiracy with said pharmaceutical companies.

THE COURT:  Right.

MR. MAYERS:  So we think that each subpoena requests --

THE COURT:  Well, that doesn't get you to 11 through 15, but we'll address that later.

MR. MAYERS:  I'm happy to address it --

THE COURT:  How do you get to 11 through 15?

MR. MAYERS:  Well, your Honor, you know, as we've discussed --

THE COURT:  And why can't it be deidentified, as I think HSS requires under the CFR HSS rules say that in order to get that information or give that information, Rhode Island Hospital's responsible for deidentifying that data and you're responsible for saying why it can't be deidentified.

MR. MAYERS:  So if Rhode Island Hospital takes the position that they will produce deidentified patient information to the extent it is possible for us

App. 128

to carry out our investigation, we would accept those records

THE COURT:  And did you tell the Texas judge that?

MR. MAYERS:  We didn't tell the Texas judge one way or the other.

THE COURT:  And did you tell the Texas judge essentially that you needed the information, without disclosing to the Texas judge that you had agreed to deidentified information in several other places?

MR. MAYERS:  We told the Texas judge that patient records, and again I can quote from -- I want to be sure I'm precise here.

(Judge confers with Clerk)

MR. MAYERS:  So we said, your Honor, just referring to patient records generally.

THE COURT:  Where is this?

MR. MAYERS:  This is, I believe your Honor quoted earlier in paragraph 44 of the initial Hsiao Declaration.

THE COURT:  Okay.

MR. MAYERS:  So we say, patient records: Generally without this information we cannot fully determine the scope of violations, identify patterns, or assess whether conduct was taken with intent to

defraud or mislead.  Now, yes --

THE COURT:  Well, you go on in that paragraph I think:  Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent...blah, blah, blah.

This is Ms. Hsiao's, again, under oath affidavit.  And so:  Absence or minimization of such warnings, multiple patient outcomes...blah, blah, blah...Finally, providing patient records can provide essential investigative leads, parents may be witnesses about which disclosures were made, patients --.

How were parents -- are you investigating fail to disclose the side effects or like -- how are parents involved with off-label prescriptions?

MR. MAYERS:  We think that the representations, again, we're not saying that off-label prescription alone is an FDCA violation.  We think that communications with parents perhaps could be relevant to this idea that the hospital and its employees acted in concert with pharmaceutical companies.

THE COURT:  Okay.  But this is where Ms. Hsiao I think may have a problem.  On page 18, further down in the paragraph she says:  The Government cannot fully determine the scope of the violation, identify patterns

of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability; and she says that with respect to needing the individualized patient information.  And so she says that, but she doesn't represent in there that, in fact, she had agreed to or you, the Department of Justice had agreed to deidentified information in several other cases. Correct?

MR. MAYERS:  Your Honor, I think that the important word to focus on is "fully".  I think our position is that, of course, de-anonymized records would allow us to more fully determine the scope of any potential violations.  Again, as your Honor noted earlier, there are negotiations that happen between a subpoena recipient and the Government, and in those negotiations we have agreed to accept anonymized records.

THE COURT:  Okay.  We're going to find out from Rhode Island Hospital if you've done that with them, and we're going to get an affidavit from Mr. Gunn, right, saying one way or the other.

MR. MAYERS:  Yes, one way or the other whether those conversations --

THE COURT:  Ever took place, and with whom.

Okay.  Go ahead, continue.

MR. MAYERS:  So your Honor, I was going through the First Circuit's factors for.

THE COURT:  So let's agree to disagree on whether 11 through 15 are relevant.

MR. MAYERS:  Yes.  Your Honor, just to reiterate for your Honor's benefit, we think they're relevant both to show intent to mislead, and also if we're investigating off-label promotion oftentimes it is important to determine where those drugs ended up and so we think also the patient records are relevant for that.

THE COURT:  And so are you -- is the DOJ going to go follow up and find parents and patients and interview them about what they were told?

MR. MAYERS:  Potentially, yes.

THE COURT:  And you don't think that's an incredible invasion based on a hunch when DOJ has nothing more?  You don't think that's part two?  If you've got something then, you know, then maybe you get that information, maybe.  But since you're just starting with this broad sweep you don't think that's a little bit invasive?  Can this Court issue an order for somebody who says, you know what, I don't think that Viagra should be prescribed and I want to find

everybody in the state of Rhode Island who has been prescribed Viagra --

MR. MAYERS:  Your Honor --

THE COURT:  -- and while we're at it, everybody in the DOJ.

MR. MAYERS:  Your Honor, we are not, again, targeting only the prescriptions; right?  We are targeting this potential scheme and we're trying to figure out how it worked or if it worked.

THE COURT:  Right; the patients would have no relevant information unless there's a scheme.

MR. MAYERS:  The point of the investigation is to you know, again, we've laid out why we think there --

THE COURT:  Do you understand why the parties are saying that this is an intentionally broad effort to chill the rights of these minors in Rhode Island which have a statutory protection for gender-affirming care.  You can agree with it, I can disagree with it, anybody in this courtroom can disagree with it; but our Legislature has protected it.  And it is ridiculous to say that you're going to find 14- and 15-year-olds who are undergoing gender reassignment or gender treatment and question them about what was told to them by their doctor.  How invasive is that?  And on a hunch that we

App. 133

might have an investigation into false billing practices that may or may not include four people.

MR. MAYERS:  Your Honor, I would claim there are horrific stories pointing the other way as well.  And I would also note --

THE COURT:  In what other way?

MR. MAYERS:  Indicating the damage done to children by these very --

THE COURT:  But that's getting into whether you agree with it or not.  I don't care whether you agree with it or not, I don't care at all.

Rhode Island, according to Justice Alito in *Scrmetti,* has the right to decide -- and by the way, also in *Dobbs* and in many other cases, states are best situated to protect the health of their citizens.  They say it in *Dobbs*, they say it in *Skrmetti*, they've probably said it in other cases.  It doesn't really matter whether you think it's a good idea or not, because you're not a scientist and neither am I.  It doesn't matter if anybody here thinks it's a great idea or not.  There are stories on both sides.  Mr. Love Hubbard told you stories about children who were, who had suicidal ideation until they received the care. That is not what this Court is deciding and frankly that's not what the Department of Justice is deciding;

correct?

MR. MAYERS:  Correct, your Honor.  Congress has enacted -- Congress has decided to criminalize misbranding.

THE COURT:  Misbranding can happen by whom?  Who can misbrand?

MR. MAYERS:  So as I explained, there are, again, two potentials:  So (A) it is typically the manufacturer --

THE COURT:  Define "misbranding" for me, please.

MR. MAYERS:  So there are multiple ways a drug can be misbranded.  That is found in 352, 21 USC 352. The ones we have discussed in our papers most are, I'm just quoting from the statute:  A drug shall deemed to be misbranded in its labeling is false or misleading.

THE COURT:  Okay.  Who labels drugs?

MR. MAYERS:  Your Honor, typically the manufacturer.

THE COURT:  Okay.  So that's not Rhode Island Hospital and that's not the parents or children.

So tell me the other ways.

MR. MAYERS:  So also there is, you know, and I want to clarify after I point to the other section or subsection, excuse me.  It's 35 -- 352(f) says unless the labeling's adequate directions for use, is also the

other one, the other subsection we had pointed to. Your Honor, again --

THE COURT:  I'm sorry, say that again.

MR. MAYERS:  There's 352(f) talks about adequate directions for use.

THE COURT:  Again, that comes from the manufacturer; correct?

MR. MAYERS:  Yes, most often the manufacturer will in the first instance decide --

THE COURT:  Just so that you know, the Fifth Circuit denied the stay in a one-sentence order.

MR. MAYERS:  So that means that Judge O'Connor's order is in effect in (indecipherable).

THE COURT:  Unless I quash subpoena --

MR. MAYERS:  Which would be --

THE COURT:  -- or enjoin the Department of Justice, or enjoin Rhode Island Hospital, or all of the above.

MR. MAYERS:  So your Honor, yes, a manufacturer distributor can misbrand a drug.  They decide the labeling.  Often in the first instance it goes through the FDA approval process.  Our argument here is (A), that can happen by a manufacturer, and Rhode Island Hospital would have evidence of that.

THE COURT:  How?  How on earth would they have

-- were they the place where these drugs were officially tested and approved by the FDA?  Were they the center?

MR. MAYERS:  So your Honor, under 352(f), adequate directions for intended use, the intended use under the CFR provision we cite.

THE COURT:  Then don't we get into Ozempic and Wegovy.  You know, I mean so basically you're saying that it would be okay if the Department of Justice went and got everybody's records who's taking those drugs; correct?

MR. MAYERS:  Your Honor, that is not my position and I --

THE COURT:  Why not?  It could be misbranding.

(Indecipherable crosstalk)

THE COURT:  Or is it because of the people who are taking them that are less vulnerable?

MR. MAYERS:  No, your Honor, that is not the case.  But I'm still trying to explain how a drug can be misbranded.  That was your Honor's question, --

THE COURT:  Go ahead.

MR. MAYERS:  -- so I'm explaining false or misleading any particular and also directions adequate for intended use.

THE COURT:  Okay.  And that comes from?

MR. MAYERS:  This is in 21 USC 352.

THE COURT:  Who misbrands?

MR. MAYERS:  So again, in the first sentence the manufacturer distributor decides the labeling, and that goes through the FDA approval process.

THE COURT:  Okay.

MR. MAYERS:  Our position is with respect to Rhode Island Hospital's potential witness, they may have communications from the pharmaceutical company that are evidence of the intended use.

THE COURT:  Right.  Rhode Island Hospital lawyers sent you terms to find those, and you didn't respond; right?

MR. MAYERS:  I believe that's correct as to the search terms.

THE COURT:  That was in February, no response; except hey, let's have a meeting; right?

MR. MAYERS:  Your Honor, I don't believe that that exempts Rhode Island Hospital from collecting those documents or from --

THE COURT:  They have the documents.  They're asking you how -- what if I said to you I want everything that the Department of Justice has written that includes the word "preempt".

MR. MAYERS:  It would be a lot of paper.

App. 138

THE COURT:  Yeah.  So that's what they're saying, let's get some much search terms to narrow down the search.  They offer that, and you ghosted them.

MR. MAYERS:  Your Honor, I don't think that their e-mail exempts them from attempting to comply in the meantime.  We know from their filing in the Northern District of Texas --

THE COURT:  They did intend to comply.  They gave you six pages, which you haven't produced to this Court.  I don't know what's in those six pages, and I'm sure the Texas judge didn't.  But you also didn't respond to their search terms.

MR. MAYERS:  Your Honor, again --

THE COURT:  I mean they're undergoing this process in good faith, and you can understand why as a judge I would take it if a party says we're negotiating with this other party; and then the other party comes to court, that I think it's misleading the court not to tell the court -- whether in Texas or here or Ohio or wherever -- the facts, the real facts about the communication.  And I recognize that you weren't there, and it was the gentleman sitting behind you and the other people who were part of those communications. But that was misrepresented in Texas, and so that record in Texas is based on misrepresentations.

App. 139

MR. MAYERS:  Your Honor, Judge O'Connor's order did not --

THE COURT:  Based on misrepresentation.

MR. MAYERS:  No, your Honor, it's not -- Judge O'Connor --

THE COURT:  It wasn't?  It wasn't?  It was a motion to stay.  It was not a motion to reconsider.

MR. MAYERS:  Your Honor, and he said if he would have had that record beforehand when he first ruled.

THE COURT:  Yeah, but we don't know -- first of all, you chose Judge O'Connor in Texas.  Let's just admit that.  At least be honest enough to admit that.

MR. MAYERS:  Admit what, your Honor?

THE COURT:  That you chose Fort Worth where there's two judges intentionally knowing that you were going to get a forum, since you had lost seven of these, every single one of them that were filed in other cases; right?

MR. MAYERS:  Your Honor, there were many reasons why the investigation is being carried on in the Northern District of Texas.  As the affidavit that you received yesterday *ex parte* indicates, there are potential targets, potential witnesses there.  I believe there are certain --

THE COURT:  There are potential targets and

witnesses here.

MR. MAYERS:  Yes.

THE COURT:  We have a court of three judges, so we can offer you an extra judge.  Why not file here?

MR. MAYERS:  Well, the investigation was not carried on here necessarily.  We are given --

THE COURT:  But you can't tell me when it went to Texas.

MR. MAYERS:  When what went to Texas?

THE COURT:  The investigation.  When did it go to Texas?  Because it was in D.C. until, when?

MR. MAYERS:  Your Honor, the investigation, again the statute says "carried on"; right?

THE COURT:  Where is it being carried on?

MR. MAYERS:  So, again, our submission is it's being carried on in the Northern District of Texas.

THE COURT:  Great.  When?  When did it start there?

MR. MAYERS:  The investigation I believe there were few months ago, maybe a little bit, I don't remember the exact date, but --

THE COURT:  In April; right?

MR. MAYERS:  No, your Honor.

THE COURT:  In March?

MR. MAYERS:  Before April.  If I remember

correctly I believe there were, yes, communications in March.

THE COURT:  Okay.  So not in July of 2025.

MR. MAYERS:  I can't speak for, again, every member of the team.  I don't believe there were any specific conversations in July 2025.

THE COURT:  But the investigation wasn't being carried on there.

MR. MAYERS:  At that time, your Honor -- again, your Honor, the investigation shifts all the time.

THE COURT:  I know, you said that.

MR. MAYERS:  Well, I mean I think that's true.

THE COURT:  Well, they shift for reasons, and if you're telling me that now this is centered in the Northern District of Texas as an officer of the court, I am taking your representation of that.  And I'm taking Ms. Hsiao's under oath representations that that's correct.  But as I already indicated, if I ever find out that that's not correct you and Ms. Hsiao and anybody else who filed false representations to this Court -- I can't speak to the judge in Texas, but if I were him I would be furious that you didn't tell him the full landscape before he decided things; and he didn't have a jurisdictional nexus at the time he decided.  You gave him that after the fact.  And I

understand that on a motion for a stay he said it wouldn't have made a difference to me anyway.  But you know what, doing that while not telling him, to this date you haven't told him that, hey, by the way, we were in ongoing conversations on FaceTime or whatever with Rhode Island Hospital.

MR. MAYERS:  Yes, the Hsiao Declaration does speak to those.  And again, Rhode Island Hospital submitted those to the court in both the Northern District of Texas and to the Fifth Circuit now.

THE COURT:  Well, the Fifth Circuit was deciding on a stay and they did it in one sentence, so I'm not impressed.

MR. MAYERS:  Regardless, the Fifth Circuit has reviewed the record, including those April e-mails, and concluded that Rhode Island Hospital is not likely to succeed on the merits.

THE COURT:  Great, in Texas.  Now we're here.

Tell me what's going on with the rest of your argument here because I have some questions and we're getting late.

MR. MAYERS:  Yes, your Honor.  So those are, I believe we were walking through the First Circuit's factors for subpoena (indecipherable).

THE COURT:  Yup.

App. 143

MR. MAYERS:  We've discussed at length.

THE COURT:  You didn't give me the third or fourth factor.

MR. MAYERS:  Yes, I was getting there.  I recognize that the second factor your Honor and I disagree on, that Requests 11 through 15.

THE COURT:  Right.

MR. MAYERS:  So I would ask, you know, even if your Honor concludes those are, that we still have 1 through 10.

THE COURT:  I think the time to negotiate that was before today, don't you?

MR. MAYERS:  Not necessarily, your Honor.

THE COURT:  Okay.

MR. MAYERS:  On alternative factor 3 or element 3, however you look at it, whether the information is adequately described, we point to the Supreme Court in *McPhaul* which says, you know, there's a relatively broad inquiry, permissible scope of materials that could reasonably be sought if necessarily broad.

I won't cite the D.C. Circuit case because I know your Honor has a preference for First Circuit law, but I think that Supreme Court decision recognizes that --

THE COURT:  Well, it's not just that I just have

a preference.  I'm required to follow First Circuit law.

MR. MAYERS:  Completely understood, your Honor. But the Supreme Court here has said that, you know, a Government investigation that is relatively broad means that there is a, you know, again on the back end a relatively, you know, broad permissible scope of materials that the Government can seek.

THE COURT:  Okay.

MR. MAYERS:  And then fourth, your Honor, the fourth factor, excuse me, is whether proper procedures had been employed in issuing the subpoena.  The parties dispute that that fourth factor is met here.

THE COURT:  How did you issue the subpoena?

MR. MAYERS:  So the Assistant Attorney General for the Civil Division signed the subpoena early July and it was served by e-mail I believe on the, on Rhode Island Hospital.

THE COURT:  Is that proper service?

MR. MAYERS:  We asked if they would accept service by e-mail.

THE COURT:  But is it proper service?  Because now they said they would accept it, but maybe they're not bound by that, right, by the rules of this case. Are they bound by that?

MR. MAYERS:  By accepting service of the subpoena --

THE COURT:  By saying they would accept it by e-mail.

MR. MAYERS:  -- in July 2025?

THE COURT:  By saying they would accept it by e-mail.

MR. MAYERS:  I believe they, I believe the e-mail responded that they accepted it, so I believe --

THE COURT:  Okay.

MR. MAYERS:  I don't think they disputed they were not properly served with the subpoena in July.

THE COURT:  But you're calling into question any informal communications that you had with Rhode Island Hospital.  You understand that; right?

MR. MAYERS:  Your Honor, I believe we submitted the e-mail, that acceptance as far as e-mail is (indecipherable)?

THE COURT:  They also submitted the e-mail about the search terms that nobody responded to, and until they asked for a meeting that they never had any intention of holding; right?

MR. MAYERS:  Your Honor, whose intention of holding?

THE COURT:  DOJ.

MR. MAYERS:  I don't know when the e-mail was sent, whether we had (indecipherable) or not.  I believe --

THE COURT:  It was sent on the 28th.  So you're telling me you think on the 28th you hadn't already decided to go to the Northern District of Texas?

MR. MAYERS:  Oh, I believe the decision to file the petition had not been determined when we, you know, reach out about it.

THE COURT:  Okay.

MR. MAYERS:  So the fourth element, again, no one disputes it, so I think that one is satisfied here.

THE COURT:  Uh'huh.

MR. MAYERS:  So I'll turn to some of the counter-arguments.

THE COURT:  I have a bunch of questions, so go ahead.

MR. MAYERS:  Yes.  So we've discussed statutory authority and the relevance factors a decent amount.

I will also note that on the overbreadth arguments, if your Honor agrees that some of the requests are overbroad the proper remedied we would submit is narrowing the subpoena rather than quashing it.

THE COURT:  But you're saying I don't have the

authority do that.

MR. MAYERS:  Your Honor, I'm assuming that you disagree with us on that point.  So of course we maintain that we think that any further litigation should take place in Texas; however, if your Honor disagrees with us we submit that narrowing rather than quashal is the right.

THE COURT:  Who bears the cost of litigation in Texas?  The taxpayers of the State of Rhode Island?

MR. MAYERS:  Would it be Rhode Island Hospital, I believe, so.

THE COURT:  But what about the Child Advocate.

MR. MAYERS:  Yes, your Honor, the Child Advocate in Texas, I believe, I don't know exactly how she's funded.

THE COURT:  It's state funding.  So the taxpayers of the State of Rhode Island, you submit, should be required to go to the forum that you chose.

MR. MAYERS:  Yes, your Honor, we think that is the proper way to challenge the order of --

(Indiscernible crosstalk)

THE COURT:  Okay.  I just want the record to be clear that that is what the DOJ is suggesting.

MR. MAYERS:  We are.  We just think that as a, you know, especially with standing, we think the only

way to really set aside the order of Judge O'Connor is to go to the Northern District of Texas for the Fifth Circuit.  That is our position.  I think that's --

THE COURT:  But they weren't in there, so I know you take the position that they can't collaterally attack an order that they weren't a party to and that they weren't notified of until after of the fact; but I think you have kind of a difficult row to hoe on that one.

Why should the Child Advocate be precluded from challenging the subpoena here, when it wasn't a party in Texas?  Can you answer that specifically.

MR. MAYERS:  Yes.  I think, as I've discussed with your Honor, we don't think any remedy here can result in the undoing of Judge O'Connor's order, and so we think as a matter of redressability at the least any relief from Judge O'Connor's order needs to be sought either in front of him or in the Fifth Circuit.

THE COURT:  But if I quash the subpoena there is nothing, and if I enjoined the Department of Justice, which is what the Child Advocate has asked, then they don't have to -- then nothing can be provided to you because you would be enjoined from receiving it; correct?

MR. MAYERS:  That would be we the -- or I

believe your Honor believes would be the effect of that injunction. But again, the order would still be, Judge O'Connor's order would still be live and enforceable.

THE COURT: But if a judge orders somebody to show up for trial, and then they cut a deal and they plead to the case, that order to show up for trial is void because that doesn't exist anymore; right?

MR. MAYERS: Yes, if we voluntarily cut a deal.

THE COURT: I'm not talking about voluntarily.

MR. MAYERS: If we cut a deal, sure.

THE COURT: I don't care about the voluntarily. What I'm saying is that court orders become nullities all the time; right?

MR. MAYERS: By agreement of the parties.

THE COURT: No. Sometimes by operation of law, of the court quashing of subpoenas.

MR. MAYERS: Again, they haven't pointed to a case, movants haven't, where a district court, a federal district court enters an order enforcing a subpoena and another federal district court entered one, you know, quashing that same subpoena afterwards.

THE COURT: Have you, do you have a case that's similar to this one where the Department of Justice went to an inconvenient forum to enforce a subpoena

without giving notice to the party?

MR. MAYERS:  We have cases that stand for the general proposition that one district court cannot essentially review the work of another.

THE COURT:  I wouldn't be reviewing his work; right?  I'm reviewing the subpoena.

MR. MAYERS:  Your Honor, we've been talking about his work for quite a while now.

THE COURT:  Well, we are because I think the Department of Justice intentionally mislead the judge in the Northern District of Texas.

MR. MAYERS:  I strongly disagree, and Judge O'Connor does too.

THE COURT:  Well, I don't know if he disagrees. I don't think he knows about all of the other stuff that you've said here about the conversations about deidentified data.  That wasn't provided to him.  In fact, Lisa Hsiao specifically said you couldn't have deidentified data, and part of his finding is based on that.  And that was untrue at the time she wrote it, and it remains untrue today, and that representation made in an affidavit in the Northern District of Texas; and that judge has the right to call her in and ask her to explain it.  Now, will he, I don't know.  But if it turns out that that misrepresentation has been made

here, then I will.

Now, putting that aside, it doesn't matter what he does.  We're talking about separate motions to quash that are brought before this Court, and I'm trying to find out why you think the collateral attack doctrine would apply against the Child Advocate when they had no notice, no opportunity to be heard, and certainly it can't be the scheme that the taxpayers of the State of Rhode Island are responsible for going to Texas to litigate something.

MR. MAYERS:  Your Honor, we think the cleanest way to think about it is probably with respect to Rhode Island Hospital would be the collateral attack doctrine.

THE COURT:  But they weren't in Texas either; right?

MR. MAYERS:  They are in Texas.  They've litigated -- again, they could have gone for reconsideration.

THE COURT:  But they haven't moved for reconsideration.  They chose to appeal --

MR. MAYERS:  They could have.

THE COURT:  -- because the time was short; correct?

MR. MAYERS:  I don't know, I can't speak to

their motives or their thought processes as to why not move for reconsideration and instead move for a stay of that appeal, or appeal and then move for a stay.  But again, I think that --

THE COURT:  Don't you think this was complicated by your choice of forum?

MR. MAYERS:  How so, your Honor?

THE COURT:  No?

MR. MAYERS:  I'm trying to understand.

THE COURT:  Well, if you had come here for a motion to enforce, then they would have responded and we would be here, where they are.

But instead you came to a district and didn't provide notice and had the order issued the same day you filed it without an opportunity to be heard in a foreign -- in a forum that they can't even be required to provide the records in because it's too far away, under HIPAA.  So you created this morass, believe me, and Rhode Island Hospital helped; and in the future I'm sure Rhode Island Hospital is not going to make that mistake, they will always file a motion to quash, as will everybody, and I think the Department of Justice is going to spend a lot of time responding to motions to quash.

MR. MAYERS:  Your Honor, we exercised our

authority under 3486 to move to enforce in a district in which it --

THE COURT:  I understand that.

MR. MAYERS:  -- was carried on and so --

THE COURT:  That's not the question.  The question is the collateral attack.  You're trying to put the collateral attack doctrine up front and say everybody is precluded because of this Texas ruling that where the judge wasn't provided all of the information and the parties weren't there.

MR. MAYERS:  Your Honor, I think that our choice of venue, the correctness of it under 3486 is relevant to whether the collateral attack doctrine applies.

THE COURT:  I don't think so, not if they weren't parties.

MR. MAYERS:  Again, they appeared in front of Judge O'Connor.  They sought relief in front of Judge O'Connor.

THE COURT:  After the fact.  And the Child Advocate has never appeared in front of Judge O'Connor.

MR. MAYERS:  Yes, but as we covered earlier, your Honor, 1782 says that motion for reconsideration after the fact complies with due process.

THE COURT:  Okay.  So let's say you gave due process to Rhode Island Hospital.  How does that

preclude the Child Advocate from collateral attack?

MR. MAYERS:  Your Honor, we think it precludes a collateral attack like this one because regardless of the relief your Honor orders, the order of Judge O'Connor will remain, and that order directs Rhode Island Hospital to produce the documents.

THE COURT:  In 14 days; in two days from now.

MR. MAYERS:  Yes.

THE COURT:  And you guys are not talking about any kind of like reality as to whether they can actually happen.

MR. MAYERS:  We haven't had those discussions yet.

THE COURT:  When did you plan on having them?

MR. MAYERS:  Assuming we will.  My point --

THE COURT:  Today, I would suggest.

MR. MAYERS:  But my point is, your Honor --

THE COURT:  Okay.

MR. MAYERS:  -- that the order will remain regardless.  Regardless of the remedy they've requested, that order will remain and it will essentially require as of now Rhode Island Hospital to turn over those documents.

THE COURT:  But if I preclude you from receiving them and I preclude them from giving them -- let's say

I preclude you from receiving them, then what?  You're going to violate my order?

MR. MAYERS:  We will not violate your order, your Honor.

THE COURT:  Okay.  Then what?

MR. MAYERS:  We will go likely First Circuit. We will not --

THE COURT:  Great, go to the First Circuit.  Let them decide.  There's already a case in front of the First Circuit because every other court that has decided this besides the Northern District of Texas has quashed these subpoena; correct?

MR. MAYERS:  I know in Green (phonetic) I did brief that case, so I'm aware of the BCH appeal and I am the one litigating it, so, yes.

THE COURT:  Okay.  Great.  When is your argument?  Your brief is not due with them until July.

MR. MAYERS:  So the answer is due in July.  We filed ours in April, mid April, and Boston Children's basically asked for a three-month extension, and so as of now oral argument has not been set.

THE COURT:  So why shouldn't we just hold this and wait to see what they decide?  If the subpoena is overbroad, then it's overbroad in the First Circuit and Rhode Island Hospital would have to comply with

First Circuit law as I do.

MR. MAYERS:  Your Honor, because we have one in order in front of Judge O'Connor that we think is enforceable.

THE COURT:  That you wrote and that he granted after four hours.

MR. MAYERS:  That he granted.

THE COURT:  After four hours.

MR. MAYERS:  Your Honor, with respect, I don't think any district judge would take kindly to, oh, you considered this only for a few hours.

THE COURT:  Well, you withheld information from him.  Of course he --

(Indecipherable crosstalk)

MR. MAYERS:  I disagree, your Honor. Judge O'Connor --

THE COURT:  I don't, and I'm making the finding that the Department of Justice withheld relevant information from Judge O'Connor, just so you know.

MR. MAYERS:  So I will turn to the privacy argument, and again the --

THE COURT:  Let's get there.  I have questions, so let's move because we're after 5:00.

MR. MAYERS:  We will, yes.  So yes, the First Circuit in *Whelan v. Roe* and some of the

follow-on cases do speak to this idea of informational privacy. But at the same time the First Circuit has said that such a right must often give way to considerations of public interest.

THE COURT: What's the public interest in identifiable information?

MR. MAYERS: In enforcing --

THE COURT: Identifiable information.

MR. MAYERS: Your Honor, the public interest is, as our declaration explains, as we've discussed, determining the extent of any false billing scheme that informs the relevant intent under the FDCA, at least as to the FDCA.

THE COURT: So you're saying that a statutory -- that an investigation into a statutory civil or minor criminal offense supersedes constitutional rights?

MR. MAYERS: No, your Honor. I think the determination as to what the Constitution protects is informed by considerations of public interest, just as it was in *Whelan*, for example, and so my position is, our position is there is a public interest that weighs heavily in favor of enforcing currently existing federal law and that is what we are pursuing.

THE COURT: But you're pursuing that with respect to -- do you understand the disconnect between

we're pursuing this because we think maybe somebody might have conspired with the drug manufacturers or the labelers or the issuers or the doctors or the hospital to mislabel, misbrand, mislead people about this drug, and so therefore we need the mental health records of children in DCYF care who have been diagnosed with gender dysphoria. Do you not see that that is a leap that you haven't connected?

MR. MAYERS: So, your Honor, this is -- if you will allow, this is not our FD theory, but just imagine that we were in the false billing context, --

THE COURT: Uh'huh.

MR. MAYERS: -- and there it is, you know, perhaps you would think more apparent as to why patient records were needed, --

THE COURT: Uh'huh.

MR. MAYERS: -- and there, if you would agree with that then presumably under these cases you would also agree that the privacy interest is different.

THE COURT: The privacy interest in what? You're asking for all of their records. Do you understand how broad your subpoena is? I've never seen a subpoena quite that broad in 25 years of criminal work.

MR. MAYERS: My understanding is that it's

pretty basic language.  It is also --

THE COURT:  Basic language for these subpoenas in this case where you're seeking these drugs, records.

MR. MAYERS:  I believe that this is typical language used in the FDCA context and subpoenas like this is one.

THE COURT:  Uh'huh.

MR. MAYERS:  But what I was saying, your Honor, is that if there is a relevant need, which we submit there is for patient records in the FDCA context to inform (A) who got misbranded drugs and (B) -- potentially misbranded drugs, and (B) whether there was false billing which informs fraudulent intent, that that need, that investigatory need constitues a public interest that affects the privacy, you know, inquiry.

THE COURT:  Okay.  Okay.  You've answered it.

MR. MAYERS:  Your Honor --

THE COURT:  I think that the difference between a constitutional right and a statutory right is something that the DOJ is failing to address, and I think it's pretty clear the First Circuit has an informational privacy right, and I would argue that Justice Alito in *Dobbs* reaffirmed that right.  I think it's pretty clear in *Dobbs* that he says there's a difference, there is a decisional privacy and there's

informational privacy and here's why *Roe* was misguided in its original decision, because it focused on decisional privacy and there isn't one, and here but there is an informational one.

MR. MAYERS:  Your Honor, a few responses.  So the *Dowry* case, which is 842 F.2d 913 --

THE COURT:  Where is that?

MR. MAYERS:  First Circuit.

THE COURT:  Uh'huh.

MR. MAYERS:  -- is a constitutional privacy case and it says often that such privacy interests must often give way to considerations of public interest.

THE COURT:  But don't you have to narrowly construe those things?  Don't you have to tailor that narrowly?

MR. MAYERS:  Tailor what narrowly, your Honor?

THE COURT:  Your request, when you're going to get documents that are protected by a constitutional right.  Let's say I wanted to know every gun owner in the state of Rhode Island.  I want a list everybody who owns a gun, everybody who bought one at a gun show, everybody who has one that they registered, everybody who goes to a shooting gallery, or anything like that. Why can't -- can I just get those records?  They have a constitutional right to bear arms.  Can I if I'm

investigating, you know, mislabeling of bullets as whatever, you know, the ones that break apart and the ones that don't; I can't remember the name, but you know what I'm talking about.  Why can't I get all of their records?

MR. MAYERS:  Your Honor, if a party came before you seeking such records and put forward a valid investigatory reason --

THE COURT:  Uh'huh.

MR. MAYERS:  -- for it, right, for example, you know the --

THE COURT:  I want to investigate, I want to talk to every gun owner in the state of Rhode Island, and I want to find out from every gun owner whether or not they've ever bought bullets that said they were not hollow-point bullets, but were hollow-point bullets.

MR. MAYERS:  So say, for example, that that case was in front of you, --

THE COURT:  Yeah.

MR. MAYERS:  -- and say, for example, there are also statements from the party requesting such records --

THE COURT:  Uh'huh.

MR. MAYERS:  -- that said, you know, work for a machine gunman, right --

THE COURT:  No, no.  There's a machine gun ban.  I'm not talking about that.

I'm talking about your absolutely constitutional right, I've got my little pistol in my nightside table; I'm investigating whether or not bullets have been mislabeled as hollow-point or non-hollow point.  Hollow points are legal, non-hollow -- or the other way around; whatever.  I'm investigating whether these bullets have been misbranded, so I want to know how many guns you have and when you've bought ammunition.  Don't I have the right to it under your theory?

MR. MAYERS:  If that again was a, assuming its for (indecipherable) investigatory purpose, --

THE COURT:  Uh'huh.

MR. MAYERS:  -- and again the relevance standard is quite, you know, quite forgiving in the subpoena context.

THE COURT:  Uh'huh.

MR. MAYERS:  And if there was a reason, a law enforcement reason put forward --

THE COURT:  Investigating potential, I don't have any proof, but I have a hunch that some of these bullets are being misbranded, and I have four people from Texas now who say that their bullets were misbranded when they were in Rhode Island.

MR. MAYERS:  Your Honor, to clarify, I believe the patients were Rhode Island Hospital patients.

THE COURT:  At the time.  I bought bullets in Rhode Island when I lived there.

MR. MAYERS:  Yeah, if that was the facts in front of the court I think that the court would have to consider whether those communications or whether interviewing potential, you know, owners of bullets were reasonably relevant to the investigation.  If the court concluded yes, that's fine; if the court concluded no, we would argue, and there's a First Circuit case I meant to mention to your Honor on the relevance side of this.  It's 554 F.2d 498, 503.

(Court Reporter requests clarification)

MR. MAYERS:  It's *Usery*, U-s-e-r-y.

THE COURT:  What's the page cite?  554 F.2d...

MR. MAYERS:  So 554 F.2d 498, 503, we read to suggest that even if the Court concludes that a subpoena is overbroad, the right remedy is narrowing rather than quash.  So we would suggest in that circumstance that if the government put forward a valid need for request purchase of certain bullets, for example, under the analogous circumstances --

THE COURT:  But if the Department of Justice came before me with an affidavit and they didn't notify

anybody, they don't notify the Second Amendment coalition or the gun owners of Rhode Island or D&B Guns or any of those places, they just come before me with a subpoena that says hey, by the way, we're investigating a possibility that -- this is DOJ coming to me -- that we issued an administrative subpoena to all these places and we want to know everybody who's ever bought bullets from them for the last six years and who owns a gun, we want the State of Rhode Island to provide us a list of all gun owners that they're aware of, and that's it, it's an enforcement order; I have no choice but to enforce it; right?

And so the Department of Justice is conceding that the Department of Justice could get the information as it relates to the constitutional right in the Second Amendment; right?  But that constitutional right gives way.

MR. MAYERS:  Your Honor, I'm not conceding.  I think the rights are a little different.

THE COURT:  Why are they different?

MR. MAYERS:  So I think, so it might be more relevant in the informational privacy context, right, because there isn't necessarily an analogous privacy interest in Second --

THE COURT:  Constitutional issue.

MR. MAYERS:  Agreed.  I have not read a case saying that there is some sort of Second Amendment privacy right that is analogous to the privacy right claimed here.

THE COURT:  Let me go back then.  Let's say it's the Department of Justice and they're saying you know what, we want a list of everybody who's gotten guns because we want to start enforcing the you-can't-lie-on-it and we want to know who's got medical marijuana, which is legal in the state of Rhode Island.

MR. MAYERS:  Yes, your Honor, if the Federal Government was investigating violations, potential violations of federal law and requested those records, we don't -- and again, I haven't cited (indecipherable), haven't cited cases in that context where there's Second Amendment cases speaking to some sort of privacy interest in gun ownership.

But again, we think that the -- and the First Circuit and the Supreme Court said this, that the relevant inquiry is whether the request is relevant to the needs of the investigation.

THE COURT:  The needs of the investigation.  So tell me now why you can negotiate with L.A. County Children's Hospital, or whatever they call themselves,

App. 166

and say we don't need the identified data, but you do need it here, and you told the Texas court you need it; at least Lisa Hsiao did in her under oath affidavit.

MR. MAYERS:  Your Honor, Lisa Hsiao said that the patients' records, that we need patient records, generally patient records to carry out our investigation.  She did not say --

THE COURT:  But doesn't HIPAA enforcement under the CFR, doesn't it say that you need to, doesn't HHS and HIPAA enforcement statute say that you have to show that nonanonymized data is necessary.  You have to make that showing.

MR. MAYERS:  That issue has not come up in this case or any of the others that I've worked on.

THE COURT:  Well, it's coming up now.  So, why not?

MR. MAYERS:  Can your Honor point me to a...

THE COURT:  Yup.  It's a Code of Federal Regulations so the Department of Health and Human Services enforcement, and let's see.

Is it in our Teams from earlier today, folks?

(Pause)

THE COURT:  We'll get it to you, but it's 615 in CFR, it's, whatever -- it's HSS's implementation of HIPAA, and I don't think you made that showing; do you?

MR. MAYERS:  Your Honor (indecipherable) --

(Court Reporter requests clarification)

THE COURT:  I'm arguing it.  I'm asking you about it.  You're saying that they have to come up with every possible argument and if they don't tell you what the law is then...

MR. MAYERS:  Your Honor, as we've discussed at length, your Honor discussed the adversarial process.

THE COURT:  So it's 45 CFR 164.512.  It's not an adversarial process, is it?  I thought it was just an Administrative Subpoena.

MR. MAYERS:  No; my point is, your Honor, that I have not considered the application of that here and the others have not, --

THE COURT:  Okay.

MR. MAYERS:  -- given that it has not been briefed.

THE COURT:  Gotcha.

MR. MAYERS:  I'd be happy to look at it.  I'd be happy to submit something to your Honor as to our opinion of it, but as of now given that it has not been briefed or at this point raised, I'm not in a position to address that regulation.

THE COURT:  Let me find it for you so I can read it to you, so you can see what it says.

(Pause)

THE COURT:   45 CFR 64.   This computer is so slow; that's why I print everything out.   So, let's see.   It tells Rhode Island Hospital that they have to -- they can only provide anonymized data unless there's been a showing that, I can't find the exact language because I can't read on this thing.   Let me see.

(Pause)

THE COURT:   Subsection, guys?   Anyone?   Okay, so it says basically -- oh, that's employer.

At any rate, it talks about what's required, and one of the requirements is a showing that anonymized data can't be used and it goes through different disclosures, victim of crimes, victims of child abuse, when people must be informed, which they must be. Okay.   It says permitted disclosures:   A covered entity, which I believe Rhode Island Hospital is, may disclose protected health information to a health oversight activity agency authorized by law, which I think is what you're arguing.   Exceptions to health oversight activities for purposes of disclosure permitted by (indecipherable) oversight activity -- no, that's different.   This is on my desk I should have just taken it with me.   At any rate -- oh, here it is.

It's in part -- I don't know.

(Reading) In response to a subpoena, discovery request, or other lawful process that is not accompanied by an order of a court or administrative tribunal -- which is what your order is -- the covered entity receives satisfactory assurance as described in the other paragraphs from the party seeking the information that reasonable efforts have been made to ensure, to supply such parties to ensure that the individuals who is subject to protected health information that has been requested has been given notice -- which you haven't -- that the covered entity receives satisfactory assurance, blah, blah, blah; reasonable efforts have been made by such party to secure qualified protective order that meets the requirements of subsection whatever; and that a party requesting such information has made a good faith attempt to provide written notice.  We already did that.  Anyway, there is a point where they say that the Rhode Island Hospital has to make a finding that anonymized data doesn't satisfy it.

Disclosures for law enforcement purposes:  The covered entity may disclose protected health information for a law enforcement purpose, to a law enforcement official if the conditions in paragraphs

F-1 through F-6 of the section are met as applicable. So pursuant to process as otherwise required, a covered entity may disclose information as required by law, by a court order in compliance with a subpoena, a grand jury subpoena, an administrative request for which response is required by law, and under that it says the information sought is relevant. They have to make a determination for law enforcement -- which is what you are -- the information sought is relevant and material to a legitimate law enforcement inquiry; the request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought -- not sure you have that; and then (3), deidentified information could not be, reasonably be used. And that is subsection F, standard disclosures for law enforcement purposes.

So why don't you have to follow that?

MR. MAYERS: Again, your Honor, I would hesitate to opine on that regulation, it's the first it's come up; I don't have it in front of me. I would also note that if Rhode Island Hospital had concerns to that effect they could have raised them in the past 10 months.

THE COURT: Okay. All right. Go ahead.

MR. MAYERS: Your Honor, briefly I'll wrap up

and let madam court reporter...

THE COURT:  Yes, we have some replies too from the other side, and I have questions for you too.

MR. MAYERS:  Yes, so your Honor, I would be happy to answer those questions now.

THE COURT:  Okay.  Let me make sure I have them. I think you already answered who or what entities can be held liable for misbranding; is that correct?

MR. MAYERS:  Yes, I have.

THE COURT:  And you don't need -- we're agreed you don't need patient's name, Social Security number, home address to investigate billing fraud or off-label promotion or misbranding; correct?

MR. MAYERS:  We think that that information would assist in our investigation.

THE COURT:  I'm asking if you need it.

MR. MAYERS:  Again, it would assist.  Is it absolute every circumstance?  As we've discussed we have accepted anonymized data in other cases, in other interactions requested of other subpoena recipients, so we would say that we're willing to accept that, we have been so far; that it is not -- that the information you read off is not necessarily irrelevant to our investigation.

THE COURT:  But you agreed to not -- to forego

it in other cases where you made deals, I think it's Pittsburgh, Los Angeles, Maryland; I don't know.

MR. MAYERS:  Yes, we have, and I believe Judge O'Connor said that he had reviewed other courts (indecipherable), so presumably in, for example --

THE COURT:  When did he say he reviewed other court's orders?

MR. MAYERS:  He said in his order on the motion for stay.

THE COURT:  I have that somewhere.  Tell me where.  Okay, so it's document 12 in his case.

MR. MAYERS:  He says on page 4,(Reading) Enforcing the instant subpoena, the Court consider RIH's long-term noncompliance with the subpoena and the arguments in opposition that have been made to other district courts.

THE COURT:  Where is that?  On page 4?

MR. MAYERS:  This is the second full...

THE COURT:  Second full paragraph?

MR. MAYERS:  Yes.

THE COURT:  Oh, okay.  (Reading) The court considered Rhode Island Hospital's long-term noncompliance -- which we've agreed now isn't a hundred percent accurate.

MR. MAYERS:  This is after Judge O'Connor

reviewed their submission.

THE COURT: -- (Reading) with the subpoena and the arguments in opposition have been made to other district courts. And he says Petition 12 -- no -- 4, ECF 1, so he just read it from Rhode Island Hospital's filing. Is that correct?

MR. MAYERS: I believe he might be citing to our petition there.

THE COURT: I see. Okay.

MR. MAYERS: But I will note that there is public briefing on the anonymization point that Judge O'Connor could have reviewed and considered, again.

THE COURT: But did you tell him that you had accepted anonymized data as part of a deal in other states and that you had -- you told us you offered it to Rhode Island Hospital; and we'll get an affidavit from Mr. Gunn, and Rhode Island Hospital is going to answer that.

MR. MAYERS: Again, your Honor, just to clarify, I have said that to the best of my recollection that offer was made. I cannot confirm what Mr. Gunn will say. I cannot confirm that --

THE COURT: No, I'm not holding you to that. You weren't there.

MR. MAYERS:  And I don't want to hold  - I can't hold Mr. Gunn to that either.

THE COURT:  Well, he's going to file an affidavit under oath saying one way or the other; right?

MR. MAYERS:  That's what we have discussed.

THE COURT:  That's what I ordered.

MR. MAYERS:  Yes, please, your Honor.

THE COURT:  Okay.  Go ahead.

MR. MAYERS:  I can't remember exactly the question I was answering.  My point is there is public briefing on this anonymization point that Judge O'Connor had accessible to him when reviewing our petition.

THE COURT:  Okay. Go ahead.  Did you have anything else you wanted to say with respect to that?

So we've already gone over the fact that you didn't inform the Texas court that you had been in ongoing negotiations with Rhode Island Hospital.  You told them that the last communication was February, which wasn't accurate.

MR. MAYERS:  The last such communication.

THE COURT:  If Ms. Hsiao is going to hang her hat on that as far as representation being accurate, I'm not hopeful for her chances.

App. 175

But you didn't inform them that it was still ongoing up like that day and the day before.  Why not?

MR. MAYERS:  I can't speak to why that decision was made or not.  I don't think that that decision was necessarily or that those communications are relevant to the standard in front of the court.

Ultimately we got one document, six pages, over 10 months.

THE COURT:  But doesn't it go to due process, whether they were afforded due process in Texas?

MR. MAYERS:  Your Honor, as we've discussed, the ability for Rhode Island Hospital to appear and move for reconsideration, which they forewent, we think that satisfies due process.  Again, they were heard on their arguments.

THE COURT:  We're going to hear them about whether they --.  They weren't heard on their arguments; they were heard on their arguments with respect to the motion to stay.

Now, so you're saying that post hoc notice to Rhode Island Hospital satisfies due process?  That's Government's argument?

MR. MAYERS:  Yes.  The ability to appear and move for reconsideration we think here, as in 1782 cases we cite discussed, we think that ability for

App. 176

Rhode Island to show up pre the date on the miscellaneous calendar and makes their arguments, that opportunity, which they forewent, satisfies due process.

THE COURT:  Well, I don't think they forewent it forever.  Do you?

MR. MAYERS:  They have not moved for reconsideration, your Honor, as far as I'm aware.

THE COURT:  So Rhode Island Hospital is challenging the subpoena here and saying it needs to be quashed, and it's clear that they didn't know you were filing in Northern District of Texas and would have no reason -- there's 94 Districts in the United States so would be no reason for them to assume there was filing in the Northern District of Texas.  Can we at least agree on that?

MR. MAYERS:  Yes.

THE COURT:  Okay.  Good.

So the collateral attack doctrine is similar to *res judicata*; right?  Isn't that essentially what it is?

MR. MAYERS:  Yes, there's the Sixth Circuit case -- I'm sorry, that Child Advocate cited which relies on *res judicata*.

THE COURT:  Okay.  But that's what it is

essentially; right?  It's saying issue preclusion, you can't come here and attack in a different court an order of a separate court where you are a party in that case; correct?

MR. MAYERS:  Litigated and (indecipherable) the decision on the merits, et cetera, yes.

THE COURT:  I'm sorry, say that again.

MR. MAYERS:  Yes, yes, where it was litigated and there was a decision on the merits, which there was here.

THE COURT:  Correct.  So that's what you're arguing.

MR. MAYERS:  Yes, with respect to that doctrine that is what we are arguing here.  And as your Honor and I discussed earlier, the response is that because Rhode Island Hospital did not appear before Judge O'Connor entered the order, that affects and nullifies the application of the collateral attack doctrine, to which we responded; it's not because they had the responsibility to come in and litigate via a motion for reconsideration.

THE COURT:  But the Child Advocate didn't -- oh, that gets me to two other things:  (1) are there similar cases that you know of other than class actions, which are obviously not similar here, where

nonparties to prior litigation will be precluded from challenging the consequences flowing from that litigation?  And I will give you the example of *Martin v. Wilks* where the Supreme Court allowed nonparties to a court-ordered consent decree to challenge the employment decisions made pursuant to that decree.

MR. MAYERS:  Your Honor, I acknowledge *Wilks*; however, I would point the Court to *Taylor v. Sturgell* which does seem to suggest that adequate representation, that doctrine could apply beyond the context of that class action.

THE COURT:  Right.  I mean like in a consent decree, right, that's what *Wilks* was, it was a consent decree; and the court said no, you can't be bound by a consent decree that you weren't a party to; right?

MR. MAYERS:  Yes, I believe that is the holding in *Wilks*.

THE COURT:  Okay.  All right.  Good.

Now, how do you propose that Rhode Island Hospital decide who was in DCYF care, and who wasn't during what relevant period.  How are you defining DCYF care in order to -- if I made a finding that just the Child Advocate has that, wouldn't the Child Advocate's argument and Rhode Island Hospital's argument that but

it necessitates Rhode Island Hospital identifying their patients and their clients and their client's medical records to separate them out.

MR. MAYERS:  Yes.

THE COURT:  Okay.

MR. MAYERS:  The Child Advocate has appeared, in the Declaration says that there are some, you know, patients in DCYF custody, --

THE COURT:  Uh'huh.

MR. MAYERS:  -- so we would propose that she would provide that list to the hospital.

THE COURT:  She cannot provide that list to you --

MR. MAYERS:  I'm not saying --

THE COURT:  -- or to the hospital.  When were they in DCYF custody?  You have a six-plus year span of your subpoena.  Are you saying anybody who was in DCYF custody for any time?  Is there a relevant time?  Are you -- is there a relevant determination?  People go in and out of the care, children who are vulnerable because of either parental neglect or parental abuse or mental health problems that their parents can't handle go in and out of State care.

How do you propose -- it's your subpoena -- that we separate it out?

MR. MAYERS:  Your Honor, we would propose that it is those children currently in DCYF custody --

THE COURT:  Today?

MR. MAYERS:  -- or those that the Child Advocate has standing to represent.  That is our understanding of Rhode Island law.

THE COURT:  She can represent people for issues -- so if they were in DCYF February of 2022, she can represent them with respect to informational privacy for that time period; right?

MR. MAYERS:  Your Honor, it is my understanding of Rhode Island law that she represents those currently in DCYF custody.  Now, if your Honor concludes that the quashal order -- of course we don't agree it should be quashal -- but if your Honor reaches that point and concludes that the scope of relief that your Honor can provide is quashal for DCYF and those in DCYF custody currently or those covered by DCYF, or if there's a question, for example, if we maintain it's custody currently, Child Advocate puts forth Rhode Island law that says it applies --

THE COURT:  You're not deciding this; I am, right?

MR. MAYERS:  Yes, your Honor.  That's what I'm proposing.  So if that was your Honor's conclusion,

that it was a, you know, quashal tie to those in DCYF custody, we would be happy to consider any Rhode Island authority that says the Child Advocate has standing to represent both those currently in custody and those who were. If that is what Rhode Island law says, if Rhode Island law provides --

THE COURT: What if I just say it.

MR. MAYERS: Your Honor, if Rhode Island law, if that's what Rhode Island law says...

THE COURT: Ms. Medeiros is here and can probably answer that question if I put her on the spot.

MR. MAYERS: And again, if that's what Rhode Island law says, and we'd agree it's not an Article III, but that's what the Child Advocate has standing to represent. So it's a question of Rhode Island law that, you know, we'd be happy to look at it if that's your Honor's conclusion.

THE COURT: And how are you going to separate out those children? And don't say give us a list.

MR. MAYERS: Your Honor, I think that is a -- we will, we will allow Rhode Island Hospital to make that decision. We will take them on their word that they applied your Honor's order in line with those terms.

THE COURT: Okay.

Does anybody want to be heard.

MR. LOVE HUBBARD:  Yes, your Honor.

(Judge confers with Court Reporter).

THE COURT:  Today, or tomorrow morning?

MR. LOVE HUBBARD:  Your Honor, I think I need three minutes.

MR. MAYERS:  About the same, your Honor.

(Judge confers with Court Reporter)

THE COURT:  We're still taking a break, about five minutes.

(Recess)

THE COURT:  All right.

MR. OLSHAN:  Yes, your Honor.  I believe I'll go first and then Mr. Hubbard will follow me, and I will be brief in the interest of time because it's very real for Rhode Island Hospital.  The Fifth Circuit has now denied our request for a stay and we would ask the Court, if the Court is inclined, to quash the subpoena both as to the request from the Child Advocate, but on behalf of Rhode Island Hospital in full.

I think today's argument has made clear that the basis for the issuance of the subpoena, the statutory basis as well as the indicia of improper purpose and bad faith is sufficient for this Court to conclude, similar to other courts around the country, that this subpoena should be quashed in full.

We'd also ask the Court to order, if the Court is inclined on the record today, that the Government be enjoined from seeking to collect, receive -- whichever verb the Court chooses -- records that are responsive to the subpoena issued to Rhode Island Hospital last July and that Rhode Island Hospital is similarly enjoined from producing to such responsive to the subpoena.

I would note and I'd ask the Court, if the Court is inclined, to inquire of the government the proposed order that the Government submitted to Judge O'Connor that Judge O'Connor signed on April 30th, the second paragraph says that, Failure to fully comply with the subpoena or show just cause for continued noncompliance may result in sanctions up to and including this court holding at witness in contempt.

Those are the sanctions that Rhode Island Hospital is facing.  I'd ask the Court to confirm with the Government that it is "just cause" for Rhode Island Hospital to not produce records if there is a court order issued by this Court prohibiting that and quashing the subpoena.

MR. MAYERS:  Okay.  Why don't you answer that now on the record, Government.

MR. CAMPBELL:  What's the question, your Honor?

App. 184

If you could just restate it.

THE COURT:  If I issue an order enjoining the Government from receiving the records and enjoining Rhode Island Hospital from producing the records, is that just cause for Rhode Island Hospital not complying with the Texas order?

MR. CAMPBELL:  I think that determination would be made by Judge O'Connor in Texas and --

THE COURT:  Well, are you going to be seeking to hold Rhode Island Hospital in contempt?

MR. CAMPBELL:  We fully intend to comply with whatever order this Court issues.

THE COURT:  Okay.

MR. OLSHAN:  I understand Government counsel to be saying, your Honor, if this Court enters an order prohibiting the Government from seeking to enforce the subpoena further or collecting responsive records to the subpoena, that the Government will abide by that order, just as Rhode Island Hospital will comply with any order that prohibits our production of those records responsive to the subpoena.

THE COURT:  That's what I understood the Government to be saying, as well.

MR. CAMPBELL:  Just to be clear and for the record, your Honor, the Government will follow whatever

order this Court issues and potentially appeal it if the Government determines so.  I will simply note for the record that the current action before the Court is a Miscellaneous Action on a motion to quash.  We don't necessarily agree that the Government or -- excuse me -- that the Court can enjoin the parties in this context.  The relief before the Court is whether to grant the motion to quash.

THE COURT:  The Child Advocate asked for injunction.

MR. CAMPBELL:  She asked for it in their papers --

(Court Reporter requests clarification)

THE COURT:  You need to come to the podium.

(To Mr. Olshan) You can stay there because he's only going to be a minute, at most.

MR. CAMPBELL:  Certainly, your Honor.  I'm simply noting for the record that the Government believes that an injunction issued in connection with a Miscellaneous Action that is a motion to quash is outside the scope of the relief that should be afforded the proper vehicle --

THE COURT:  Do you have any citations?

MR. CAMPBELL:  The proper vehicle would have been a civil action seeking an injunction.

THE COURT:  Okay.  You can be seated.

MR. OLSHAN:  Your Honor, a few more points.  I did just want to put on the record that at no time in our conversations with the Government was an offer made to accept deidentified records like it has been asked to others.  And I would note the question of patient identities is not just something that implicates Requests 11 through 13 or 15.  It implicates multiple additional requests.  For example, Request 2 deals with billing records.  That's going to have information about patients.  Request 3 deals with all documents relating to the use of diagnosis codes.

THE COURT:  So the Government's representations that they made that offer to Rhode Island Hospital is inaccurate.

MR. OLSHAN:  Correct.

THE COURT:  And so Mr. Gunn will get us an affidavit today or by 9:00 tomorrow Eastern time, that whether he did or didn't and to whom he made that; and if he didn't, then that leaves this Court with a question about what was told to the judge in Texas, and I think that, you know, there's been ample evidence that the judge in Texas was not given all of the relevant information.  Go ahead.

MR. OLSHAN:  Thank you, your Honor.

App. 187

With respect to the analysis on venue, there's important information that appears to have just been made public in this hearing, which is that I believe Government counsel said that there were discussions or communications that started in mid March with the Northern District of Texas and that there was -- they are working in, quote, collaboration with the Northern District of Texas.

The *Cooper Tire* case from the District of Columbia circuit that deals with these factors relevant to where something is being carried on that talks about the hub, et cetera, the eight factors that Mr. Hubbard mentioned, Love Hubbard; excuse me.

Our view is based on that additional information; it underscores the lack of an appropriate venue in the Northern District of Texas.

I'll also confirm for the Court that there were no facts put in font of the court there.  It was just a reference in one line in the petition or motion to compel that said under 3486(c) the investigation is being carried on.  The Hsiao Declaration did not speak to that.  Only subsequently did they provide something. The Court has I believe ordered the Government to provided a redacted copy of that to the parties.

THE COURT:  Right.  And I'd like that done

before tomorrow morning, and you can redact only that which is confidential law enforcement privilege.

MR. OLSHAN:  I do want to just highlight that the discussion the Government had with Government counsel about the FDCA theory was all over the place.

THE COURT:  Uh'huh.

MR. OLSHAN:  There was discussion about endocrine disorder and gender dysphoria, billing coding, there was discussion about promoters.  I do want to highlight for the Court the *Gleason* case that my colleague referenced is 576 F.Supp. 2nd 385, it's *U.S. v. Caronia*, C-o-r-o-n-i-a (verbatim).  The doctor in that case, I believe that's Dr. Gleason, was essentially a paid sales rep, as we can glean from, of the manufacturer.  This is not a case that was about the prescribing practices of any doctor.  It was basically a doctor who was acting as a sales rep to promote off-label to maybe other doctors or other entities.  So we would argue that that's distinguishable.

And as to the point about the opportunity to reconsider an order that we were never able to be heard on in the first instance as a valid basis for this Court not to invoke the collateral attack doctrine, we disagree with.  Getting a judge to revisit a decision

that was made without due process cannot be the same thing as getting a judge to consider it in the first instance.

THE COURT:  And, in fact, there's federal rules that sort of speak to what a court can and cannot reconsider; correct?

MR. OLSHAN:  That's correct.

THE COURT:  Okay.  Go ahead.

MR. OLSHAN:  Your Honor, I think those are the few points I wanted to make just again to stress given where things are in the court's order that has not been stayed, obviously Rhode Island Hospital requests as soon as this Court is able to make a reasoned, determined, excuse me, a decision, we would ask the Court to act, quash the subpoena in full and enjoin the parties in the way that we described a few minutes ago. Thank you.

THE COURT:  Thank you.

Mr. Love Hubbard.

MR. LOVE HUBBARD:  Thank you, your Honor.

Very briefly, the Government's argument with respect to the Child Advocate and the collateral attack doctrine was, I think I heard him say that the patients are somehow in privity with the hospital and/or that they were adequately represented.

THE COURT:  I think he abandoned that later and said essentially that it's not the same argument as the Hospital with respect to the collateral attack and Child Advocate.

MR. LOVE HUBBARD:  Just to be clear, the court in the Northern District of Texas said, "Rhode Island Hospital cannot show how it" in italics "would be harmed, rather than its patients, who are third parties."

So very basis for the court's order in Texas was that the patients were not present there and that their interests were not considered and so --

THE COURT:  And so the record is abundantly clear, they weren't notified.

MR. LOVE HUBBARD:  Correct.  And about notice, your Honor, one point on that.  I found out about this order because the Department of Justice issued a press release on May 1st publicizing it before it was served on Rhode Island Hospital, which they say happened the following Monday.  So when we consider that, with all of the other things that we've talked about, improper purpose, I think what I want to end with is that enough is enough.  The Government's investigative power is massive, and it depends on good faith actors acting in good faith to accomplish legitimate law enforcement

purposes.

I think the record is clear here that that is not what happened, and so when you're having a conversation with them about narrowing scope or deidentifying data, on the deidentifying point I'll note that the UPMC Court specifically rejected the offer to receive anonymized data which the DOJ made there, again, only in response to the motion to quash; and the court said no, you don't get the benefit of a normal procedure when you don't follow that normal procedure. And I think that's what the Court should do here. The Government is going to continue to press these investigations unless the Court stops it.

THE COURT: Okay. I think you indicated that NYU had received a subpoena from a grand jury in the Northern District of Texas, and that's the press release that was issued today? Yesterday?

MR. LOVE HUBBARD: Late last night, I believe.

THE COURT: Okay. So clearly if that's the case there's a grand jury in the Northern District of Texas and that's not a secret anymore; correct?

MR. LOVE HUBBARD: Yes, your Honor.

THE COURT: So I'm going to order the Government to provide also notice to this Court about when, which specific date that was convened.

MR. LOVE HUBBARD:  And just --

THE COURT:  For purposes of this case.

MR. LOVE HUBBARD:  For the purposes of jurisdiction as well.

THE COURT:  Correct.

MR. LOVE HUBBARD:  I think there's some gliding on their part; they're saying nationwide investigation. It can't be the basis for an enforcement action against Rhode Island Hospital for them to have a nationwide investigation into these generalized practices.  And really what it comes down to, when you try and hear them articulate a proper FDCA theory, they don't gender-affirming is legitimate.

THE COURT:  Right.

MR. LOVE HUBBARD:  They don't get to make that decision.

THE COURT:  Correct.  This is not policy and I think that that's where, you know, and mean I know you're very familiar with the Department of Justice and how it operates, and we have always had a usual course with the Department of Justice where we can rely on what was presented to the Court; but this is the second time now that a party has found out by a press release the status of their case.  And was it the DOJ that issued the press release?

MR. LOVE HUBBARD:  Yes, your Honor.

THE COURT:  In the other case I believe it was HHS.  But it's, you know, sort of not the ordinary course and that's why I say, you know, they should be prepared to field thousands of motions to quash, tens of thousands maybe, because I don't know how any party can rely on a conversation with the Department of Justice that they're working on compliance, given the tract of this case.  And I so mean I'm not a practitioner, but as a judge I would say to anybody you should be filing motions to quash in every case where the Department of Justice is seeking information and you're trying to negotiate it, and then they can respond.  It's unfortunate that the process comes down to this level of adversarial process.

MR. LOVE HUBBARD:  And just to --

THE COURT:  It never was, but...

MR. LOVE HUBBARD:  Just to emphasize, your Honor, that's exactly what happened here.

THE COURT:  Yeah.

MR. LOVE HUBBARD:  I found about the subpoena and had a motion filed within 49 hours.

THE COURT:  Yup.

MR. LOVE HUBBARD:  And we did everything in our power to prevent this from happening as soon as it

became -- as soon as we had notice of it.

THE COURT:  I understand that.  I'm just saying it's a cautionary tale.

MR. LOVE HUBBARD:  Absolutely.  Thank you, your Honor.

THE COURT:  Okay.  Is there anything further from any party?

Just so that we're clear, I want the Government to provide the sealed document to the parties on the other side.  That should be done before tomorrow morning at 9:00.  Mr. Gunn's affidavit under oath, filed and given to the parties by 9:00 tomorrow morning about the discussions that you represent to the Court were had with anonymized data with Rhode Island Hospital, and Rhode Island Hospital has now disputed that, so I want an affidavit under oath from somebody who can testify, if need be; and if it's not Mr. Gunn then find the person who it is.  And then the third thing is notice of when the grand jury began the investigation, when they first sat on this case in the Northern District of Texas.  And I don't mean when you decided among you to take it to the Northern District of Texas.  I mean when did the first witness appear before the grand jury in the Northern District of Texas.

Is there anything else?

MR. OLSHAN:  Not for Rhode Island Hospital. Thank you.

THE COURT:  Okay.  All right.  We're in recess.

(Adjourned)

App. 196

C E R T I F I C A T I O N


                I, Denise P. Veitch, RPR, do hereby certify

that the foregoing pages are a true and accurate

transcription of my stenographic notes in the

above-entitled case.


                              /s/ Denise P. Veitch_
                              Denise P. Veitch, RPR
                              Federal Official Court Reporter



                              May 17, 2026
                                  Date